UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| F5 CAPITAL, A CAYMAN ISLANDS CORPORATION, <br><br>           Plaintiff, <br><br>           v. <br><br> PETROS PAPPAS; MILENA MARIA PAPPAS; ROGER SCHMITZ; TOM SOFTELAND; SPYROS CAPRALOS; KOERT ERHERDT; RENEE KEMP; RAJATH SOURIE; EMILY STEPHENS; STELIOS ZAVVOS; OAKTREE VALUE OPPORTUNITIES FUND, L.P., OAKTREE OPPORTUNITIES FUND IX DELAWARE, L.P., OAKTREE CAPITAL MANAGEMENT, L.P., OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P., MONARCH ALTERNATIVE SOLUTIONS MASTER FUND LTD., MONARCH CAPITAL MASTER PARTNERS II-A LP, MONARCH CAPITAL MASTER PARTNER II LP, MONARCH DEBT RECOVERY MASTER FUND LTD., MONARCH OPPORTUNITIES MASTER FUND LTD., P MONARCH RECOVERY LTD., STAR SYNERGY LLC; STAR OMAS LLC; OAKTREE CAPITAL MANAGEMENT LP; OAKTREE OBC HOLDINGS LLC; OAKTREE DRY BULK HOLDINGS LLC; MILLENNIA LLC; MILLENNIA HOLDINGS LLC; MIRABEL SHIPHOLDING & INVEST LIMITED; MIRACH SHIPPING COMPANY LIMITED; BLUESEA OCEANBULK SHIPPING LLC; HERON VENTURES LTD.; and OCEANBULK CARRIERS LLC, <br><br>           Defendants. <br><br>       -and- <br><br> STAR BULK CARRIERS CORP., <br><br>           Nominal Defendant | **14 CV   9356** <br><br> No. 14 Civ. _____ <br><br> JUDGE TORRES <br><br> **NOTICE OF REMOVAL** <br><br> Removed from the Supreme Court of the State of New York, Index No. 653237/2014. <br><br>  |

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1446, and 1453, defendants Oaktree Value Opportunities Fund, L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Capital Management , L.P., Oaktree OBC Holdings LLC, Oaktree Dry Bulk Holdings LLC, Renée Kemp, Rajath Shourie, and Emily Stephens (collectively, the "Oaktree Defendants"), by their undersigned attorneys, here remove this action from the Supreme Court of the State of New York, New York County, in which the above-captioned case is now pending, to the United States District Court for the Southern District of New York and, in support of said notice, state as follows:[1]

## NATURE OF THE ACTION

1.     This action, designated *F5 Capital* v. *Pappas et al*, Index No. 653237/2014, was filed by Plaintiff F5 Capital ("Plaintiff") in the Supreme Court of the State of New York, County of New York, on October 23, 2014.

2.     The Complaint alleges that Plaintiff "is and was a holder of shares and/or a beneficial interest in shares" of nominal defendant Star Bulk Carriers Corp. ("Star Bulk") (Compl. ¶ 119), a shipping company that acquired Oceanbulk Carriers, LLC , another shipping company, and other entities in June 2014 (the "Oceanbulk Merger").  (*See* Compl. ¶¶ 5, 53.) Plaintiff in substance alleges that the Oceanbulk Merger, as well as other transactions, were the result of self-dealing by the defendants in this action (the "Defendants"[2]).  (*See id.* ¶¶ 54–107.) Plaintiff has brought this action, which includes purported class action claims for dilution on

---

[1]   In filing this Notice of Removal, the Oaktree Defendants do not waive any defenses that may be available to them.

[2]   The Oaktree Defendants are not aware of any entity with the name of purported defendant "Bluesea Oceanbulk Shipping LLC."

behalf of Star Bulk shareholders not affiliated with the Defendants, as well as purported derivative claims on behalf of Star Bulk for breach of fiduciary duty, aiding and abetting breach of fiduciary duty and corporate waste, for which Plaintiff seeks several purported remedies. (*See id.* ¶¶ 130–42.)

## THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE CLASS ACTION FAIRNESS ACT

3.     This action satisfies the requirements of the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005) ("CAFA"), because:  (i) it is a putative class action; (ii) minimum diversity among the parties exists; (iii) there are no fewer than 100 members of the putative class; and (iv) there is at least $5,000,000 in controversy. *See* 28 U.S.C. §§ 1332(d), 1453; *see also Blockbuster, Inc.* v. *Galeno*, 472 F.3d 53, 57 (2d Cir. 2006); *Mattera* v. *Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 78 (S.D.N.Y. 2006).

### A.     *Putative Class Action*

4.     A "class action" is defined by CAFA as any civil action filed pursuant to Federal Rule of Civil Procedure 23 or "similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B).

5.     This action meets CAFA's "class action" definition because it asserts a claim under the class action provision of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. § 901.  (*See* Compl. ¶ 108.)

### B.     *Minimum Diversity of Citizenship*

6.     Pursuant to CAFA, a district court has original jurisdiction over any civil action in which "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).  Alternatively, such minimum diversity may be satisfied

3

if either (1) "any member of a class of plaintiffs is a foreign state or a citizen or subject of a

foreign state and any defendant is a citizen of a State," or (2) "any member of a class of plaintiffs

is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign

state." *Id.* § 1332(d)(2)(B)-(C).

   7. Plaintiff alleges that it is incorporated under the laws of the Cayman

Islands and has its principal place of business in the Cayman Islands.  (Compl. ¶ 11.)

   8. Defendant Emily Stephens is a citizen of the State of California.

   9. Because Plaintiff is a citizen of the Cayman Islands, a foreign state, and at

least one of the defendants is a citizen of a State (for instance, Emily Stephens, a citizen of

California), CAFA's diversity requirements are satisfied.  *See* 28 U.S.C § 1332(d)(2)(B).

**C.** ***At Least 100 Proposed Class Members***

   10. Plaintiffs' proposed class consists of Star Bulk shareholders not affiliated

with any of the Defendants (excepting nominal defendant Star Bulk).  (*See* Compl. ¶ 54.)  There

are several thousand such shareholders.  (*See* Declaration of Georgia Mastagaki, dated

November 24, 2014, ("Mastagaki Decl.") ¶ 4, attached hereto as Exhibit B.)  This satisfies

CAFA's class size requirements.  *See* 28 U.S.C. § 1332(d)(5)(B).

**D.** ***Amount in Controversy***

   11. In this action, Plaintiff seeks, among other forms of purported relief,

cancellation of the shares issued to the Defendants as part of the Oceanbulk and Star Bulk

transactions.  (*See* Compl., pp 36.)  In connection with the Star Bulk transaction, the Defendants

received several millions shares of Star Bulk that were valued at the time of the transaction at

$12.03 per share.  (*See* Mastagaki Decl. ¶ 6.)  Accordingly, and without conceding that Plaintiff

is entitled to any damages whatsoever, and without waiver of any the Defendants' defenses, it is

more likely than not that the amount in controversy in this action exceeds $5,000,000.  *See, e.g.*, *Blockbuster, Inc.*, 472 F.3d at 58; *Mattera*, 239 F.R.D. at 78.

**E.      Plaintiff Bears the Burden of Proving That Any of the Exceptions to CAFA Apply**

12. The party opposing removal jurisdiction has the burden of proof as to whether the discretionary or mandatory exceptions of removal under CAFA apply.  *See, e.g.*, *New Jersey Carpenters Vacation Fund* v. *Harborview Mortg. Loan Trust* 2006-4, 581 F. Supp. 2d 581, 583 (S.D.N.Y. 2008); *Brook* v. *UnitedHealth Group Inc.*, No. 06 CV 12954(GBD), 2007 WL 2827808, at *3 (S.D.N.Y. Sept. 27, 2007); *Mattera*, 239 F.R.D. at 79.  The action does not fall within any exceptions to removal jurisdiction recognized in 28 U.S.C. § 1332(d) or 28 U.S.C. § 1453(d).

**F.      This Court Has Supplemental Jurisdiction Over Those Claims Not Within the Subject Matter Jurisdiction Conferred by CAFA**

13. Those claims in the Complaint over which this Court does not have original jurisdiction under CAFA "form part of the same case or controversy."  *See* 28 U.S.C. § 1367.  Accordingly, this Court has supplemental jurisdiction over all such other claims.

**THE PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN SATISFIED**

14. This action is removable to this Court pursuant to 28 U.S.C. § 1441(a) because there is original jurisdiction and this Court embraces the place where the state court action is currently pending.

15. This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it has been filed within thirty days of the date on which a copy of the Complaint was received by Defendant Oaktree Capital Management, L.P. (the first-served Oaktree Defendant), which was served with the Complaint on November 6, 2014.

16.     This Notice of Removal is also appropriate under 28 U.S.C. § 1453(b), which provides that "[a] class action may be removed to a district court of the United States in accordance with section 1446 . . . without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants." *Id.*

17.     Written notice of this filing will be provided to all adverse parties, and a copy of this Notice of Removal will be filed in the appropriate State court, as required by 28 U.S.C. § 1446(d).

18.     Pursuant to 28 U.S.C. § 1446(a), a copy of the Complaint and summons are attached hereto as Exhibit A.

WHEREFORE, the above-described action now pending in the Supreme Court of the State of New York, County of New York, is properly removed to this Court.

Dated: November 24, 2014
      New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By: _____

Andrew J. Ehrlich
Gregory F. Laufer
Amy J. Beaux
1285 Avenue of the Americas
New York, New York  10019-6064
Tel.    (212) 373-3000
Fax    (212) 757-3980
aehrlich@paulweiss.com
glaufer@paulweiss.com
abeaux@paulweiss.com

*Attorneys for Defendants Oaktree Value
Opportunities Fund, L.P.,  Oaktree
Opportunities Fund IX (Parallel 2), L.P.,
Oaktree Capital Management , L.P.,
Oaktree OBC Holdings LLC, Oaktree Dry
Bulk Holdings LLC, Renée Kemp, Rajath
Shourie, and Emily Stephens*

7

# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

F5 CAPITAL, A CAYMAN ISLANDS CORPORATION

            Plaintiff,

        - against -

PETROS PAPPAS; MILENA MARIA PAPPAS; ROGER SCHMITZ; TOM SOFTELAND; SPYROS CAPRALOS; KOERT ERHERDT; RENEE KEMP; RAJATH SOURIE; EMILY STEPHENS; STELIOS ZAVVOS; OAKTREE VALUE OPPORTUNITIES FUND, L.P., OAKTREE OPPORTUNITIES FUND IX DELAWARE, L.P., OAKTREE CAPITAL MANAGEMENT, L.P., OAKTREE OPPORTUNITIES FUND IX (PARALLEL 2), L.P., MONARCH ALTERNATIVE SOLUTIONS MASTER FUND LTD., MONARCH CAPITAL MASTER PARTNERS II-A LP, MONARCH CAPITAL MASTER PARTNER II LP, MONARCH DEBT RECOVERY MASTER FUND LTD., MONARCH OPPORTUNITIES MASTER FUND LTD., P MONARCH RECOVERY LTD., STAR SYNERGY LLC; STAR OMAS LLC; OAKTREE CAPITAL MANAGEMENT LP; OAKTREE OBC HOLDINGS LLC; OAKTREE DRY BULK HOLDINGS LLC; MILLENNIA LLC; MILLENNIA HOLDINGS LLC; MIRABEL SHIPHOLDING & INVEST LIMITED; MIRACH SHIPPING COMPANY LIMITED; BLUESEA  OCEANBULK SHIPPING LLC; HERON VENTURES LTD.; and OCEANBULK CARRIERS LLC;

            Defendants,

        and

STAR BULK CARRIERS CORP.,

            Nominal Defendant.

**SUMMONS**

Index No.:_____

---

To the above-named defendants:

    YOU ARE HEREBY SUMMONED  to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiff's attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to

1

appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates New York County as the place of trial.  The basis of the venue is Defendants' places of business.

New York, New York
Dated:  October 23, 2014

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: _____
Mark C. Rifkin
Benjamin Y. Kaufman
Lydia Keaney Reynolds
270 Madison Avenue
New York, New York 10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653

*Counsel for Plainitff*

*Of Counsel:*

**SMYSER KAPLAN &**
**   VESELKA, L.L.P.**
Larry R. Veselka
Tyler G. Doyle
Hector R. Chavez
700 Louisiana Street, Suite 2300
Houston, Texas 77003
Tel: (713) 221-2356
Fax: (713) 221-2320

*Counsel for Plainitff*

/765654

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

F5 CAPITAL, A CAYMAN ISLANDS CORPORATION

Plaintiff,

- against -

PETROS PAPPAS; MILENA MARIA PAPPAS; ROGER
SCHMITZ; TOM SOFTELAND; SPYROS CAPRALOS;
KOERT ERHERDT; RENEE KEMP; RAJATH SOURIE;
EMILY STEPHENS; STELIOS ZAVVOS; OAKTREE VALUE
OPPORTUNITIES FUND, L.P., OAKTREE OPPORTUNITIES
FUND IX DELAWARE, L.P., OAKTREE CAPITAL
MANAGEMENT, L.P., OAKTREE OPPORTUNITIES FUND
IX (PARALLEL 2), L.P., MONARCH ALTERNATIVE
SOLUTIONS MASTER FUND LTD., MONARCH CAPITAL
MASTER PARTNERS II-A LP, MONARCH CAPITAL
MASTER PARTNER II LP, MONARCH DEBT RECOVERY
MASTER FUND LTD., MONARCH OPPORTUNITIES
MASTER FUND LTD., P MONARCH RECOVERY LTD.,
STAR SYNERGY LLC; STAR OMAS LLC; OAKTREE
CAPITAL MANAGEMENT LP; OAKTREE OBC HOLDINGS
LLC; OAKTREE DRY BULK HOLDINGS LLC; MILLENNIA
LLC; MILLENNIA HOLDINGS LLC; MIRABEL
SHIPHOLDING & INVEST LIMITED; MIRACH SHIPPING
COMPANY LIMITED; BLUESEA  OCEANBULK SHIPPING
LLC; HERON VENTURES LTD.; and OCEANBULK
CARRIERS LLC;

Defendants,

and

STAR BULK CARRIERS CORP.,

Nominal Defendant.

Index No.:_____

---

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff F5 Capital, by and through its undersigned counsel, alleges upon personal

knowledge with respect to itself and upon information and belief based upon, *inter alia*, the

investigation of its undersigned counsel as to all other allegations, as follows:

## NATURE OF THE ACTION

1.      This is a shareholder action asserting both derivative claims brought under N.Y. Bus. Corp. Law § 626 on behalf of Nominal Defendant Star Bulk Carriers Corp. ("Star Bulk" or the "Company"), as well as direct claims brought by Plaintiff on behalf of itself and the other Star Bulk shareholders not affiliated with Oaktree, the Pappas Defendants, or Monarch (the "Unaffiliated Shareholders"), against the Star Bulk Board of Directors (the "Board" or the "Individual Defendants" defined below) and certain entities owning or controlling 81.3% of Star Bulk's shares, for breach of fiduciary duty and dilution arising out of the Individual Defendant's decision to cause Star Bulk to enter into two self-dealing transactions that do not benefit Star Bulk.

2.      These interested actions include (i) the acquisition of Oceanbulk Carriers LLC ("Oceanbulk") by Star Bulk, which resulted in a merger and acquisition with entities affiliated with the Individual Defendants, at a grossly inadequate and unfair price and terms that also resulted in the dilution of Starbulk's non-controlling shareholders (the "Oceanbulk Merger"); (ii) the purchase of 34 drybulk vessels from Excel Maritime Carriers Ltd. ("Excel") (the "Excel Transaction"), another entity affiliated with the Individual Defendants; and (iii) causing Star Bulk to enter into service contracts with entities affiliated with the Individual Defendants in which Star Bulk is required to pay almost *three times* the standard industry price for services from such entities.

3.      Indeed, as a direct result of the Oceanbulk Merger, the Monarch Investors, Oaktree Investors, and the Pappas Defendants and their affiliated entities have increased their combined ownership of the outstanding shares of Star Bulk from 43.9% pre-Merger to a whopping *80.2%* post-Merger.

2

4.      As a result of the self-dealing transactions set forth herein, Plaintiff's interest in Star Bulk has been substantially diluted.  Immediately prior to the consummation of the Oceanbulk Merger, Plaintiff's shares represented 1.4% of the total outstanding common stock of Star Bulk.  Following the Oceanbulk Merger, Plaintiff's shares represented only 0.5% of the outstanding Star Bulk shares, and following the Excel Transaction, Plaintiff will hold only 0.36% of the outstanding shares of Star Bulk.

5.      Plaintiff is owned by Hsin Chi Su ("Mr. Su").  Previously, Mr. Su was instrumental in the management of Star Bulk and served as its co-chairman of Star Bulk until January 24, 2008.  Mr. Su also served as a director of the Company until his resignation on October 20, 2008.  Mr. Su was at least a 29% shareholder of Star Bulk during this time period, and until his falling out with Defendant Petros Pappas ("Pappas") in 2008, Mr. Su was active in the management of the Company.  However, after a business dispute between Pappas and Mr. Su, the Defendants have worked to exclude Plaintiff and Mr. Su from any position of influence with respect to Star Bulk and have sought to dilute Plaintiff's ownership interest through a series of transactions that are the subject of this litigation.

6.      These self-dealing transactions and the others set forth herein, orchestrated by a deeply conflicted, interested Board, are a blatant violation of the fiduciary duties of loyalty and care owed directly by the Individual Defendants to the non-controlling Star Bulk shareholders, such as Plaintiff.  Moreover, they constitute waste and conversion of corporate assets.

## JURISDICTION AND VENUE

7.      This Court's jurisdiction over the Individual Defendants (defined herein) because, at a minimum, Defendants committed the unlawful actions that form the basis of this lawsuit in

3

the State of New York and many of the Defendants have contractually waived objection to and voluntarily submitted to exclusive personal jurisdiction in the New York Courts.

8.      Indeed, the June 16, 2014 Agreement and Plan of Merger with Oceanbulk (the "Merger Agreement") central to  this Complaint includes a section entitled "Governing Law" which provides that the Merger Agreement "will be deemed to be made in and in all respects will be interpreted, construed and governed by and in accordance with the Laws of the State of New York without giving effect to any choice of Law or conflict of Law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of New York." The Merger Agreement also includes a section entitled "Jurisdiction," which provides that each of the parties to the Merger Agreement "consents to the jurisdiction of any state or federal court sitting in Manhattan in New York City or in the Federal Southern District in the State of New York … and irrevocably agrees that all actions or proceedings relating to this agreement, the merger or other transactions contemplated by this agreement may be litigated in such courts." All of the Defendants are closely related to and/or controlled by parties to the Merger Agreement, thus, this Court has personal jurisdiction over all Defendants.

9.      The various shareholder agreements and voting agreements entered into in connection with the Oceanbulk Merger likewise contain similar New York choice of law and jurisdiction provisions.

10.     Venue is proper under CPLR Article 5 because, on information and belief, certain Defendants resided in New York City for some portion of the relevant time period, and all Defendants have transacted business in this County during the time period, and because the parties have contractually agreed to venue in New York.  Indeed, Starbulk's next shareholder meeting scheduled for October 24, 2014 is to be held in New York.

## THE PARTIES

11.     Plaintiff F5 Capital ("Plaintiff" or "F5") is a company incorporated under the laws of the Cayman Islands with its principal place of business located in the Cayman Islands. F5 is an investment company principally concerned with investing and dealing in securities in the field of international shipping.  F5 is affiliated, through common ownership by Hsin Chi Su ("Mr. Su"), with TMT Co. Ltd. ("TMT"), which maintains an international fleet of shipping carriers.

12.     Nominal Defendant Star Bulk Carriers Corp. ("Star Bulk" or the "Company") is a global shipping company providing worldwide seaborne transportation solutions in the dry bulk sector.  Star Bulk's vessels transport major bulks, which include iron ore, coal and grain, and minor bulks such as bauxite, fertilizers and steel products.  Star Bulk was incorporated in the Marshall Islands on December 13, 2006 and maintains executive offices in Athens, Greece.  Its common stock trades on the Nasdaq Global Market under the symbol "SBLK".  Prior to the Oceanbulk Merger, Star Bulk had an operating fleet of seventeen dry bulk carriers and definitive agreements to build eleven other vessels.  No derivative or direct claims are asserted against Nominal Defendant Star Bulk.

13.     Defendant Petros Pappas ("Pappas") is, on information and belief, a citizen of Greece.  Pappas was the non-executive Chairman of Star Bulk before the Oceanbulk Merger and became the CEO of Star Bulk after the transaction closed.  On information and belief, during at least a portion of the time relevant to this lawsuit, Pappas  engaged in the complained-of wrongful acts for personal gain in New York.  He also submitted to jurisdiction and venue in New York.

14.     Defendant Milenia Maria Pappas ("Milenia Pappas" and together with Defendant Pappas, the "Pappas Defendants") is, on information and belief, a citizen of Greece and the daughter of Pappas.  On information and belief, during at least a portion of the time relevant to this lawsuit, she resided in the County.  Further, on information and belief, during at least a portion of the time relevant to this lawsuit, she engaged in the complained-of wrongful acts for personal gain in the County of New York and/or submitted to jurisdiction and venue in New York.

15.     Defendant Roger Schmitz is, on information and belief, a citizen of the United States and resident of the County.  On information and belief, during at least a portion of the time relevant to this lawsuit, he engaged in the complained-of wrongful acts for personal gain in the County of New York and/or submitted to jurisdiction and venue in New York.

16.     Defendant Tom Softeland is, on information and belief, a citizen of Norway.  On information and belief, during at least a portion of the time relevant to this lawsuit, he engaged in the complained-of wrongful acts for personal gain in the County of New York and/or submitted to jurisdiction and venue in New York.

17.     Defendant Spyros Capralos is, on information and belief, a citizen of Greece.  On information and belief, during at least a portion of the time relevant to this lawsuit, he engaged in the complained-of wrongful acts for personal gain in the County of New York and/or submitted to jurisdiction and venue in New York.

18.     Defendant Koert Erhardt is, on information and belief, a citizen of The Netherlands.  On information and belief, during at least a portion of the time relevant to this lawsuit, he engaged in the complained-of wrongful acts for personal gain in the County of New York.

19.     Defendant Renee Kemp is, on information and belief, a citizen of the United Kingdom.  On information and belief, during at least a portion of the time relevant to this lawsuit, she engaged in the complained-of wrongful acts for personal gain in the County of New York and/or submitted to jurisdiction and venue in New York.

20.     Defendant Rajath Sourie is, on information and belief, a citizen of the United States of America.  On information and belief, during at least a portion of the time relevant to this lawsuit, he engaged in the complained-of wrongful acts for personal gain in the County of New York and/or submitted to jurisdiction and venue in New York.

21.     Defendant Emily Stephens is, on information and belief, a citizen of the United States of America.  On information and belief, during at least a portion of the time relevant to this lawsuit, she engaged in the complained-of wrongful acts for personal gain in the County of New York and/or submitted to jurisdiction and venue in New York.

22.     Defendant Stelios Zavvos is, on information and belief, a citizen of Greece.  On information and belief, during at least a portion of the time relevant to this lawsuit, he engaged in the complained-of wrongful acts for personal gain in the County of New York and/or submitted to jurisdiction and venue in New York.

23.     Defendant Milenia Maria Pappas and Defendant Petros Pappas are referred to collectively herein as the "Pappas Defendants."

24.     The Defendants identified in paragraphs 11 to 23 above are referred to collectively herein as the "Individual Defendants."

25.     Defendant Star Synergy LLC ("Oaktree Holdco Merger Sub") is a limited liability company incorporated in the Marshall Islands and is a wholly-owned subsidiary of Star Bulk.

26.     Defendant Star Omas LLC ("Pappas Holdco Merger Sub") is a limited liability company incorporated in the Marshall Islands and is a wholly-owned subsidiary of Star Bulk.

27.     Defendant Oaktree OBC Holdings LLC ("Oaktree Holdco") is a limited liability company incorporated in the Marshall Islands.  Together with Millennia LLC, Oaktree Holdco owns Oceanbulk Shipping LLC, a Marshall Islands limited liability company, and Oceanbulk Carriers LLC, also a Marshall Islands limited liability company.

28.     Defendant Oaktree Dry Bulk Holdings LLC ("Oaktree Seller") is a limited liability company incorporated in the Marshall Islands that owns all of the outstanding limited liability assets of Oaktree Holdco.

29.     Defendant Oaktree Capital Management, L.P. ("Oaktree") is a Delaware limited partnership and a manager of Oaktree-affiliated funds holding shares of Star Bulk.  Oaktree maintains two offices in New York, one at 277 Park Avenue, 45th Floor, New York, New York 10172, and another at 1301 Avenue of the Americas, 34th Floor, New York, New York 10019.

30.     Defendant Oaktree Value Opportunities Fund, L.P. is an entity affiliated with Oaktree and is a shareholder of Star Bulk.

31.     Defendant Oaktree Opportunities Fund IX Delaware, L.P. is an entity affiliated with Oaktree and is a shareholder of Star Bulk.

32.     Defendant Oaktree Opportunities Fund IX (Parallel 2), L.P is an entity affiliated with Oaktree and is a shareholder of Star Bulk.

33.     The Defendants identified in paragraphs 27 to 32 above are collectively referenced herein as the "Oaktree Investors."

34.     Defendant Monarch Alternative Capital LP ("Monarch")is a distressed debt firm registered as a Delaware limited partnership with headquarters in Manhattan, and is a manager of Monarch-affiliated entities holding shares of Star Bulk.

35.     Defendant Monarch Alternative Solutions Master Fund Limited is an entity affiliated with Monarch and is a shareholder of Star Bulk.

36.     Defendant Monarch Capital Master Partners II-A L.P. is an entity affiliated with Monarch and is a shareholder of Star Bulk.

37.     Defendant Monarch Capital Master Partner II L.P. is an entity affiliated with Monarch and is a shareholder of Star Bulk.

38.     Defendant Monarch Debt Recovery Master Fund Limited is an entity affiliated with Monarch and is a shareholder of Star Bulk.

39.     Defendant Monarch Opportunities Master Fund Limited is an entity affiliated with Monarch and is a shareholder of Star Bulk.

40.     Defendant P Monarch Recovery Limited is an entity affiliated with Monarch and is a shareholder of Star Bulk.

41.     The Defendants identified in paragraphs 34 through 40 above are collectively referenced herein as the "Monarch Investors."

42.     Defendant Millennia LLC ("Pappas Holdco") is a limited liability company incorporated in the Marshall Islands.  Together with Oaktree Holdco, Pappas Holdco owns Oceanbulk Shipping LLC, a Marshall Islands limited liability company, and Oceanbulk Carriers LLC, also a Marshall Islands limited liability company. All of the assets of Pappas Holdco are held by Millennia Holdings LLC.

43.     Defendant Millennia Holdings LLC ("Pappas Seller") is a limited liability company incorporated in the Marshall Islands that owns all of the outstanding limited liability assets of Pappas Holdco.

44.     Defendant Mirabel Shipholding & Invest Limited is an entity controlled by the Pappas family, including Defendants Petros Pappas and Milenia Pappas.

45.     Defendant Mirach Shipping Company Limited is an entity controlled by the Pappas family, including Defendants Petros Pappas and Milenia Pappas.

46.     Bluesea Oceanbulk Shipping LLC an entity controlled by the Pappas family, including Defendants Petros Pappas and Milenia Pappas.

47.     Heron Ventures Limited ("Heron JV") is an entity in which Oceanbulk Shipping LLC holds an interest.

48.     Oceanbulk Carriers LLC ("Oceanbulk") was formed in 2012 and is a privately-held company controlled by Oaktree and its affiliates as well as other entities affiliated with the Pappas Defendants.

## FACTUAL ALLEGATIONS

## I.     THE OCEANBULK MERGER

### A.     Background of Star Bulk and Oceanbulk

49.     Star Bulk has an operating fleet of seventeen dry bulk carriers, consisting of five Capesize, two Post Panamax, two Ultramax and eight Supramax dry bulk vessels with a combined cargo carrying capacity of 1,610,935 deadweight tons and an average service age of approximately 9 years.  In addition, Star Bulk provides vessel management services to fourteen third party dry bulk vessels, including five Capesize, two Post Panamax, two Kamsarmax, two Panamax and three Supramax vessels with a combined cargo carrying capacity of 1,569,255

deadweight tons. Star Bulk has also entered into agreements for the construction of eleven fuel efficient dry bulk vessels, consisting of five Newcastlemax vessels, two Capesize vessels and four Ultramax vessels, with a combined cargo carrying capacity of 1,643,000 deadweight tons. All of the new building vessels are expected to be delivered during 2015 and early 2016.

50.     Since its founding in 2006, Star Bulk's fleet of carriers has grown to generate $32.3 million in adjusted EBITDA and $27.5 million of cash from operating activities in 2013 alone.  As of June 20, 2014, Star Bulk's market capitalization was approximately $387 million.

51.     In stark contrast to Star Bulk's long and established history of success and strong capitalization, Oceanbulk is a new company that has reported only *negative* income throughout its brief existence.

52.     Oceanbulk was formed in 2012 and is a privately-held company controlled by Oaktree and its affiliates as well as other entities affiliated with Defendant Pappas.  Significantly, Pappas served as CEO of Oceanbulk simultaneously while serving as the non-executive Chairman of Star Bulk. Oceanbulk reported an ***$11.6 million loss*** in 2013 and another ***$7.7 million loss*** in the first quarter of 2014.

**B.     Star Bulk Announces its Acquisition of Oceanbulk**

53.     On June 16, 2014, Star Bulk announced that it had entered into agreements with the Oaktree and Pappas entities to purchase Oceanbulk (the "Oceanbulk Merger"), issuing the following press release:

> ATHENS, GREECE – June 16, 2014 – Star Bulk Carriers Corp. ("Star Bulk" or the "Company") (NASDAQ: SBLK) announced today that it has entered into definitive agreements with entities affiliated with Oaktree Capital Management, L.P. (the "Oaktree Investors") and Star Bulk's Non-Executive Chairman, Mr. Petros Pappas, and certain of his immediate family members, including Milena Maria Pappas, one of Star Bulk's directors (the "Pappas Investors"), pursuant to which Oceanbulk Shipping LLC and Oceanbulk Carriers LLC  (the "Oceanbulk Companies") and entities controlled by the Pappas Investors are expected to

11

become indirect wholly-owned subsidiaries of Star Bulk in consideration for the issuance to the Oaktree Investors and the Pappas Investors of 54.104 million shares of common stock of Star Bulk (the "Transaction").

**Transaction Overview**

Through the Transaction, Star Bulk is acquiring an operating fleet of 15 dry bulk carrier vessels, with an average age of 5.6 years and an aggregate capacity of approximately 1.75 million dwt, including five Capesize vessels, two post-Panamax vessels, six Kamsarmax vessels and two Supramax vessels and contracts for the construction of 26 fuel-efficient, eco-design newbuilding dry bulk vessels including eight Newcastlemax vessels, eight Capesize vessels and ten Ultramax vessels each being built at shipyards in Japan and China. The newbuild vessels are scheduled to be delivered in 2014, 2015 and 2016.

Upon completion of the Transaction, the Oaktree Investors will own 61.3% of Star Bulk's shares of common stock and the Pappas Investors will own 12.5% of Star Bulk's common stock.  In connection with the Transaction, the Company has agreed to enter into shareholders agreements with the Oaktree Investors and the Pappas Investors providing for certain voting restrictions, standstill obligations and ownership limitations and, for the Oaktree Investors, certain rights to make Board nominations and to appoint officers of the Company.  As part of the Transaction, the Oaktree Investors, the Pappas Investors and the Company have agreed that Mr. Petros Pappas will become the Chief Executive Officer of the Company and Mr. Spyros Capralos will become Non-Executive Chairman of the Board.

**Benefits of the Transaction, Upon Completion:**

- Creates the largest, diversified, ultra-modern U.S. listed dry bulk company with a fully delivered fleet of 69 vessels approximating 8.7 million deadweight tons, including 33 Capesize and Newcastlemax vessels.  The combined fleet is one of the largest eco fleets in the world with 39 eco and 7 semi-eco vessels and the acquired ships were built or will be built at reputable Japanese and Chinese shipyards.
- The combined Company will be a prominent market player with a strong shareholder base and a significant platform well positioned to be an industry consolidator. Following the Transaction, the Company intends to pursue additional accretive acquisition transactions.
- The combined Company's size provides it with a substantial commercial presence and provides additional economies of scale on technical operations. The combined fleet will be technically managed by the Company's in-house technical management operation and all vessels are expected to utilize the commercial services of Interchart, a company affiliated with family members of Mr. Pappas in which the Company owns a 33% interest.

12

- Enhanced fleet profile positions the Company to benefit from expanding major bulk commodity trade, especially via long haul voyages. The combined fleet profile with a significant number of Capesize and Newcastlemaxes bulk carriers coupled with the current Company chartering strategy provides significant earnings and cash flow upside in strong markets.
- Significantly increases the market capitalization. Based on 54.104 million newly issued shares, the combined market capitalization, assuming the June 13, 2014 closing share price of $12.07 per share, would be $1,009 million.

The Transaction has been approved by the Board of Directors of Star Bulk, based upon the recommendation of a transaction committee of disinterested directors established by the Board of Directors of Star Bulk (the "Transaction Committee"), which negotiated the Transaction on behalf of Star Bulk. The Transaction Committee is composed of Tom Softeland, a director of Star Bulk since the inception of the Company, and Roger Schmitz, a director since July 2013 and a senior investment professional with Monarch Alternative Capital LP ("Monarch"). The Transaction Committee negotiated the Transaction value on a net asset value for net asset value basis using the average of three reputable appraisal providers.  As part of this negotiation, there was a $35 million adjustment to net asset value in favor of Star Bulk.

**Petros Pappas, Chairman of Star Bulk Carriers Corp., commented**: "We are excited to announce this transformational Transaction that, when completed, will create the largest U.S. listed dry bulk owner and operator. I would like to thank Spyros Capralos for his leadership and stewardship of the business as President and CEO, and I am pleased that Spyros will continue to provide leadership in his role of Non-Executive Chairman of the Board following the closing of the Transaction. I am looking forward to assuming the CEO role and will focus on, among other things, maximizing the performance of the existing fleet, overseeing the successful delivery of the significant existing newbuilding program, and positioning the Company to grow quickly and significantly in the highly fragmented dry bulk sector".

**Spyros Capralos, President & CEO of Star Bulk, commented**: "The Transaction marks an important next step in the evolution for Star Bulk. Since 2013, Star Bulk has dramatically improved its market capitalization and liquidity through the successful completion of the rights offering and add-on equity offering, modernized its existing fleet and placed a series of significant newbuilding orders to position the Company for the future. With this Transaction the Company creates the largest U.S. listed dry bulk company with a strong shareholder base.  We believe that the Transaction is accretive to earnings, cash flow, and net asset value, and also has additional benefits as it will dramatically increase the market capitalization and asset base, enhance the on-the-water fleet portfolio, increase the newbuilding portfolio by combining two similar newbuild

13

strategies, and improve access to capital to fund the current and assumed capital expenditure obligations.  In addition, the combined business will be well positioned to capitalize on an improving dry bulk market with significant operating leverage to rising rates.  I would like to thank the Transaction Committee of disinterested directors that have spent significant time negotiating the Transaction on Star Bulk's behalf, and I look forward to assuming my role as Non-Executive Chairman of the Board."

The Transaction is expected to close within the next 30 days subject to customary conditions, including the affirmative vote of a majority of Star Bulk's shareholders that are not affiliated with the Oaktree Investors or the Pappas Investors to approve the Transaction at a special meeting of shareholders ("Special Meeting"). Star Bulk expects to hold the Special Meeting on July 11, 2014.   The Board of Directors has established June 17, 2014 as the record date for such meeting.

In connection with the Special Meeting, the investment funds controlled by Monarch, which owns 20.9% of the outstanding shares of Star Bulk and represents 28.1% of the shareholders that are not affiliated with the Oaktree Investors and Pappas Investors, have entered into a voting agreement with the Oaktree Investors and Pappas Investors to vote all of their Star Bulk shares in favor of the Transaction.

**C.      The Oceanbulk Merger Was Hopelessly Conflicted**

54.      Unfortunately for the Star Bulk shareholders not affiliated with Oaktree, the

Pappas Defendants, or Monarch (the "Unaffiliated Shareholders"), including Plaintiff, the

Oceanbulk Merger was undertaken for the benefit the Individual Defendants, including the

Pappas Defendants, the Oaktree Investors, and the Monarch Investors, and not the  Unaffiliated

Shareholders. Oceanbulk was owned and controlled by entities that were in turn owned and

controlled by Board members and their families, and this Oceanbulk Merger is the epitome of

self-dealing.

55.      As is clear from  the Agreement and Plan of Merger, (the "Merger Agreement"),

the Oceanbulk Merger was not intended to benefit Star Bulk's shareholders but was rather

designed by the Board to favor their own interests.

14

56.     The structure of the Oceanbulk Merger is highly complex.  The Oceanbulk Merger involves a set of Sellers (Oaktree Dry Bulk Holdings LLC ("Oaktree Seller") and Millennia Holdings LLC ("Pappas Seller")), a set of Merger Subs (Star Synergy LLC ("Oaktree Holdco Merger Sub") and Star Omas LLC ("Pappas Holdco Merger Sub")), and a set of Holdcos (Oaktree OBC Holdings LLC ("Oaktree Holdco") and Millennia LLC ("Pappas Holdco")).  All of these entities are limited liability corporations incorporated under the laws of the Marshall Islands.

57.     Both Merger Subs are wholly-owned subsidiaries of Star Bulk.

58.     Together, the Sellers owned all of the outstanding limited liability assets of the Holdcos, and in turn, the Holdcos owned Oceanbulk Shipping LLC and Oceanbulk Carriers LLC (together, "Oceanbulk").

59.     Upon consummation of the Oceanbulk Merger, the Oaktree Holdco merged with and into the Oaktree Holdco Merger Sub and the Pappas Holdco  merged with and into the Pappas Holdco Merger Sub, with the Merger Subs remaining as the surviving entities.  The Merger Subs, of course, are wholly-owned by Star Bulk.  Thus, following the merger, Star Bulk would be the owner of Oceanbulk.

60.     The Merger Agreement also provided that, upon consummation of the Oceanbulk Merger, Star Bulk would purchase (i) Dioriga Shipping Company from Mirach Shipping Company Limited ("Mirach") and (ii) Positive Shipping Company from Bluesea Invest and Holding Limited ("Bluesea").  Mirach and Bluesea are both owned and controlled at least in part by Defendant Pappas and/or his daughter, Defendant Milenia Pappas.

61.     Finally, the Merger Agreement provided that, upon consummation of the Merger, Star Bulk would acquire vessels from Heron Ventures Limited ("Heron JV") in exchange for 2.1

15

million shares of Star Bulk common stock. Heron JV is a joint venture in which Oceanbulk owns indebtedness that is convertible into 50% of the equity of Heron JV. On March 14, 2014, Heron JV had purchased the business of Deiulemar, in a transaction that was partially financed by Oceanbulk.

62.     The Oaktree Investors and the Pappas entities described above are affiliated with Board Members and Individual Defendants Pappas and his daughter, Milenia Pappas, rendering these Board members hopelessly conflicted with respect to the Oceanbulk Merger.

### 1.     The Pappas Defendants Are Conflicted

63.     Pappas, a Board member of Star Bulk before and after the Oceanbulk Merger, was the non-executive Chairman of Star Bulk prior to the merger, and following the merger he became the Chief Executive Officer of Star Bulk. Also prior to the merger, and while he was non-executive director of Star Bulk, Pappas was the CEO of Oceanbulk. Oceanbulk Shipping was co-owned by Oaktree and the Pappas family at the time of the Oceanbulk Merger. Additionally, Pappas controls Mirabel Shipholding & Invest Limited, Mirach Shipping Company, and Bluesea.

64.     Defendant Milenia Pappas, also a Star Bulk Board member and the daughter of Pappas, is likewise conflicted. Milenia Pappas, along with Pappas, controls Mirabel Shipholding & Invest Limited, Mirach Shipping Company, and Bluesea, and additionally, Milena Pappas controls Millennia LLC (the "Pappas Holdco"). Oceanbulk Shipping was co-owned by Oaktree and the Pappas family at the time of the Oceanbulk Merger.

65.     In total, various Pappas-related entities owned or controlled at least 3.3% of Star Bulk shares prior to the Oceanbulk Merger, and owned 12.6% of shares following the Merger.

16

Oaktree-related entities owned 19.6% of Star Bulk shares prior to the Merger and 61.3% after, and Monarch-related entities owned 21% of Star Bulk shares prior to the Merger and 7.4% after.

66.     In contrast, Plaintiff's shares in Star Bulk represented 1.4% of the total outstanding shares prior to the Oceanbulk Merger and 0.49% after.

67.     Moreover, according the Star Bulk Proxy Statement issued on June 20, 2014 (the "Proxy" or "Proxy Stmt.") for the Oceanbulk Merger, the Oaktree Investors and the Pappas Defendants and entities they controlled (namely, the Oceanbulk Holdcos) loaned more than **$415 million** to Oceanbulk.  On May 28, 2014, that entire debt was converted to equity on terms that have never been disclosed to the Unaffiliated Shareholders.  Therefore, the Unaffiliated Shareholders (including Plaintiff) have no way of determining the effect of this conversion on the Company or the real cost to the Company or its shareholders of the Oceanbulk Merger. Nor do the Unaffiliated Shareholders have any way of determining the benefit to the Pappas Defendants from the conversion of the debt.

**2.      Defendant Schmitz is Conflicted Due to His Affiliation with Monarch**

68.     Defendant Schmitz is also a conflicted Board member who sat on the two-person purportedly independent "Special Committee" of the Star Bulk board despite the fact that according to the merger proxy Schmitz *was the Board member who first suggested a transaction between Star Bulk and Oceanbulk.*

69.     Schmitz is Monarch's representative on the Star Bulk Board.  The Monarch Stockholders group is a large shareholder of Star Bulk, owning 21% of outstanding shares of Star Bulk prior to the Merger.  Schmitz is a managing principal of Monarch.

70.     In addition, Schmitz serves on the board of Dolphin Capital Opportunities Ltd., Navig8 Crude Tankers Inc., and Navig8 Product Tankers Inc.  His role with Navig8 Crude

Tankers Inc. and Navig8 Product Tankers Inc. (members of the "Navig8 Group") has brought him into a comfortable relationship with Oaktree Capital Management. In particular, Schmitz's Navig8 Group and Oaktree joined forces to form Navig8 Chemical Tankers, another shipping company.

71.     Defendant Schmitz molded and shepherded the negotiating process of the Oceanbulk Merger in concert with Hamish Norton, who worked for Pappas and Oaktree as President of an Oceanbulk entity. In other words, the individual actually responsible for proposing the Oceanbulk Merger was later deemed "disinterested" and placed in charge of determining whether the transaction that he engineered was fair and in the best interest of Star Bulk and its non-interested shareholders. To no one's surprise, Schmitz approved his own idea.

72.     The Monarch Investors and certain of its advisory clients were beneficial owners of, and have voting and dispositive power over, 6,161,004 Star Bulk shares as of the date of the Proxy Statement. Collectively, these "Monarch Stockholders" were claimed to represent 28.2% of the purportedly "Unaffiliated Stockholders" by the Proxy Statement. Star Bulk's characterization of Monarch's shares as "unaffiliated" misstates Monarch's economic relationships with the various Oaktree and Pappas entities.

73.     On June 16, 2014, the Monarch Investors entered into a Voting Agreement with Oaktree Dry Bulk Holdings LLC, Millennia Holdings LLC, and Mirabel Shipholding & Invest Limited (the "Voting Agreement"). This Voting Agreement undermines the Individual Defendants' characterization of Monarch as "Unaffiliated Stockholders." Instead, the Voting Agreement appears to have been the result of Oceanbulk's demands and discussions with Monarch going back at least to April 15, 2014, nearly two months before any fairness opinions or reports had issued to or from the Special Committee. Given the apparent existence of an

agreement in principle between Monarch and Oceanbulk going back to April 2014, Monarch cannot be characterized as an unaffiliated stockholder by the time of the June 16 Merger Agreement; Monarch's loyalty to the Sellers and its decision to recommend the Merger had been practically decided months earlier.

74.     Furthermore, neither the Proxy Statement nor the Voting Agreement state what consideration the Sellers conveyed to Monarch in exchange for the Voting Agreement. Presumably, Monarch would only assent in advance to the Voting Agreement for some economic consideration from its counterparties—the Oceanbulk sellers and/or the Oaktree and Pappas Groups. Monarch may expect to reap some undisclosed benefit in its dealings with Oaktree and Pappas in unrelated business of no benefit to Star Bulk. *See* Proxy Stmt. at 98 ("Oceanbulk would only be willing to enter into a potential transaction if, among other things . . . Monarch agreed to enter into a voting agreement to support the Oceanbulk transaction . . . .")..

75.     Monarch has extensive economic affiliations with Oaktree, Pappas, their related entities. First, Monarch has entered into joint ventures with Oceanbulk Maritime and the Pappas family in the crude tanker business. *See* Proxy Stmt. at 18 (Madison Crude Carriers LLC as joint venture between Monarch and the Pappas family). The Proxy Statement makes reference to other entities held by the Pappas family that could cause "conflicts of interest" and "distraction" without any further detail, explanation, or even identification of such other entities. *See* Proxy Stmt. at 18.

76.     Second, Monarch and Oaktree both participated in the Company's rights offering in May 2013 to acquire the substantial shareholding position they held as of date of the Merger Agreement, and this resulted in Monarch placing Defendant Schmitz on the Star Bulk Board. *See* Proxy Stmt. at 94.

77.     Lastly, Monarch never disclosed any other past, present, or anticipated investments, transactions, and relationships it might presently or prospectively have with Oaktree or the Pappas groups.  For instance, the Proxy Statement broadly stated that "the Monarch Stockholders and the Pappas family have certain business relationships in the oil tanker sector (but not in the drybulk sector)."  *Id.* at 104.  These "business relationships" may extend beyond Madison Crude Carriers LLC.  The Proxy Statement did not disclose the type and extent of interests between Monarch and the Pappas family.  Monarch's wide involvement with distressed assets further implies a danger for conflicting interests in this transaction in light of the huge capital commitment for new-build vessels acquired from Oceanbulk and concomitant debt that Star Bulk had to take on.

**D.     The "Special Committee" Was Conflicted**

78.     In an attempt to make the Oceanbulk Merger appear to be the result of a disinterested, conflict-free process, the Individual Defendants formed a purported "special committee" to evaluate and negotiate with Oceanbulk.

79.     The Special Committee comprised two Star Bulk directors – Defendants Softeland and Schmitz. At least one of these two directors – namely, Schmitz – was hopelessly conflicted due to his relationship with Monarch, a large shareholder, and the fact that the Oceanbulk Merger was ***his idea.***

80.     As set forth above, Defendant Schmitz was conflicted with respect to the Oceanbulk Merger insofar as (a) the Merger was his idea, and (b) he had much to gain as a result of the merger vis a vis his affiliation with Monarch, which is not only a major shareholder of Star Bulk but also regularly partners with Oak Tree and the Pappas entities.

20

81.     As a result of their conflicts, the Special Committee failed to fully investigate the entire fairness of the Oceanbulk Merger.

82.     According to the Proxy, the Special Committee never investigated any other potential transactions or any other bids.  On the contrary, since half of the Special Committee (*i.e.,* Defendant Schmitz) was responsible for initiating the Oceanbulk Merger, the Special Committee was not interested in pursuing any alternatives to the Oceanbulk Merger.

**E.     The Evercore Opinion was Inadequate**

83.     Further, although the Special Committee retained Evercore Group LLC ("Evercore") to issue a "fairness opinion" regarding the Oceanbulk Merger (the "Evercore Opinion"), Evercore did not sufficiently analyze whether the Oceanbulk Merger would be fair to all shareholders, or just the Oaktree, Pappas, and Monarch shareholders.

84.     Some of the inadequacies of Evercore's Opinion included, among other things, the following:

- The Evercore Opinion did not factor in all potential costs to the Star Bulk shareholders. For example, the Proposed Merger offers the officers and directors full indemnification to Star Bulk's directors, officers, and employees—notwithstanding the Securities and Exchange Commission's disapproval of overbroad indemnification provisions. *See* Proxy Stmt. at 126-27. Fully indemnifying the officers and directors in advance attempts to insulate them from any adverse consequences for not complying with their fiduciary duties of loyalty and care. In other words, they were encouraged to quietly acquiesce to the transaction rather than pointing out how it harmed the Company's interest. The cost of broadly indemnifying litigation expenses to a wide list of Star Bulk employees did not appear to be analyzed in the Evercore Opinion.

- The Evercore Opinion did not assess Star Bulk's or Oceanbulk's asset valuations— despite management's history of not recognizing impairments. *See, e.g.,* Nov. 24, 2010 Letter from S.E.C. to Prokopios Tsirigakis (demanding explanation for Star Bulk's lack of impairment losses in March 23, 2010 Form 20-F).

- The Evercore Opinion did not opine on post-merger solvency.

- The Evercore Opinion did not assess going-concern value.

- The Evercore Opinion did not assess the ability of Star Bulk to comply with debt covenants given anticipated future borrowings.

- The Evercore Opinion did not assess the cost of lost opportunities. *See* Proxy Stmt. at 18 ("the Company has agreed to renounce any interest or expectancy in, or in being offered an opportunity to participate in, any corporate opportunities that may be presented to or become known to Oaktree or any of its affiliates"). Oaktree is the largest private equity investor in the shipping industry and by industry estimates has invested approximately $3.3 billion in at least 16 shipping entities over the past several years. It would be expected that almost all future transactions will be shown to them.

- The Evercore Opinion did not assess the cost of having a part-time management that may become distracted from Star Bulk's business. *See id.*, at 19 ("Some of our key executive officers will not devote all of their time to our business, which may hinder our ability to operate successfully").

- The Evercore Opinion did not assess the effect of the May 28, 2014, conversion of $415 million of debt from the Pappas Defendants and entities they owned or controlled on the Oceanbulk Merger, on the Company, on the Pappas Defendants, or on the Unaffiliated Shareholders.

85.     The limitations and deficiencies of Evercore's Opinion were obviously affected by the $2.95 million in "success fee" Evercore was to receive over the $800,000 base fee *only* if the Oceanbulk Merger closed.

**F.     The Oceanbulk Merger Was Not in the Best Interests of Star Bulk or Its Unaffiliated Shareholders**

86.     Despite the stated goal of "minimizing . . . corporate expenses" (*see* Proxy Stmt. at 32), the Proposed Merger was, in reality, an "inside-out" merger meant to reward the Pappas Defendants and their cohorts through increased shareholder control and new sweetheart management positions at Star Bulk. *See id.*, at 120-21. Furthermore, Star Bulk's pro forma post-merger commitments to spend $1.37 billion on new ships will almost certainly require the issuance of new equity, although the Proxy Statement waved away such concerns as merely a possibility. *See id.*, at 21-22.

87.     For instance, the Proxy Statement sets out the following figures:

| Obligation | Amount (in USD, Millions) | Reference in Proxy Stmt. |
|---|---|---|
| Pro forma debt | $384 | See p.3 |
| Assumed debt | $124 | See p.22 |
| New Heron-related debt | $25 | See p.22 |
| Debt for Ships under construction | $756 | See p.21 |
| **Total Debt** | **$1,288** | |
| Pro Forma Equity | $970 | See p.36 |
| **Additional Capital Needed** | **$614** | See p.21:<br>$1,599.1(total payments)<br>− $229.4 (paid)<br>− $530.7 (debt commitment)<br>− $225.5 (debt commitment) |

88. As a result of the Oceanbulk Merger, leaving apart the effects of the conversion of the $415 million in debt from the Pappas Defendants and entities they owned or controlled, Star Bulk incurred an additional **$1.3 billion** in debt and will need to raise an additional **$614 million** in capital. Such a result threatens the financial health of Star Bulk, further diluted the present shareholders' equity and is a far cry from the "moderate levels of leverage" represented in the Proxy Statement. *See* Proxy Stmt. at 32. Moreover, upon information and belief, the Pappas Investors and Oaktree Investors took this opportunity to convert $415 million of Star Bulk debt that they held into equity.

89. The result of the Oceanbulk Merger is that the Monarch Investors, Oaktree Investors, and the Pappas Defendants and their related entities, which previously owned 43.9% of the outstanding shares of Star Bulk now own *80.2%* of the outstanding shares of Star Bulk following the Merger.

23

90.     The Oceanbulk Merger was not entirely fair to Star Bulk.  The Defendants claimed that the number of shares to be issued to the Oceanbulk sellers in the transaction was supposed to be based on the comparative net asset value of the two sides.  However, as a new company that had already lost some $20 million dollars in one and one-half years, Oceanbulk had lost $1.9 million even before accounting for the huge unfunded commitment for construction of new ships.  Instead, the Defendants calculated Oceanbulk's net asset value based on the supposed net asset value of its fleet.  Since both Oceanbulk and Star Bulk had engaged in transactions that would have required their assets to be fairly valued within a year or less before the transaction, there should have been little need to adjust the parties' net asset values.  However, the Defendants caused Star Bulk to agree to $351,306,000 in adjustments, of which $281,635,000 (or 80.2%) were upward adjustments of Oceanbulk's value (at a time when ship prices were dropping), while only $69,671,000 (or 19.8%) were adjustments of Star Bulk's value.  This unfair and unwarranted adjustment led to the Oceanbulk sellers improperly receiving the extra value.

**G.     The Oceanbulk Merger is Approved by a Conflicted Board**

91.     The press release quoted above was released on June 16, 2013, and announced that the Star Bulk Board would hold a vote on the Oceanbulk merger on July 11, 2014 – *only twenty-five calendar days after the Merger was announced.*

92.     On July 9, 2014 Plaintiff wrote to counsel for many of the Defendants identifying the numerous flaws of the Oceanbulk merger, including its self-dealing, the lack of a Special Committee, and other concerns set forth herein.

93.     Also on July 9, 2014, Plaintiff instructed that its shares be voted AGAINST the Oceanbulk Merger.

94.     Despite Plaintiff's objections, on July 11, 2014 the Star Bulk Board approved the

Oceanbulk Merger and the Merger was immediately consummated.

95.     According to a press release issued by Star Bulk on July 11, 2014:

Following the closing of the [Oceanbulk Merger], the Oaktree Investors own
61.3% of Star Bulk's shares of common stock and the Pappas Investors own
12.6% of Star Bulk's common stock, based on 83,597,969 common shares of Star
Bulk issued and outstanding.  The Company has entered into shareholders
agreements with the Oaktree Investors and the Pappas Investors providing for
certain voting restrictions, standstill obligations, and ownership limitations, and,
for the Oaktree Investors, certain rights to make Board nominations and appoint
officers of the Company.  In connection with the closing of the [Oceanbulk
Merger], the Company has appointed four new members to its Board of directors:
Rajath Shourie as a Class A Director, Emily Stephens as a Class B Director,
Renee Kemp as a Class C Director and Stelios Zavvos as a Class A Director.  As
part of the [Oceanbulk Merger], Mr. Petros Pappas has been appointed as the
Chief Executive Officer of the company and Mr. Spyrou Capralos is the Non-
Executive Chairman of the Board.

## II.    THE EXCEL TRANSACTION

96.     Unfortunately for Unaffiliated Shareholders such as Plaintiff, the Star Bulk Board

continues to engage in business practices that will benefit only the controlling shareholders and

Board members and will harm shareholders.

97.     On August 19, 2014 Star Bulk announced a plan to acquire 34 drybulk vessels

from Excel Maritime Carriers Ltd. ("Excel") (the "Excel Transaction") in a press release, stating:

ATHENS, GREECE – August 19, 2014 – Star Bulk Carriers Corp. ("Star Bulk"
or the "Company") (NASDAQ: SBLK) announced today that it has entered into
definitive agreements with Excel Maritime Carriers Ltd. ("Excel") pursuant to
which the Company will acquire 34 operating vessels (the "Vessels") for an
aggregate of 29.917 million shares of common stock of Star Bulk and $288.39
million in cash (the "Vessel Purchase Transactions").

**Overview of the Vessel Purchase Transactions**

Through the Vessel Purchase Transactions, the Company expects to acquire 34
secondhand drybulk carriers, consisting of 6 Capesize vessels, 14 sistership
Kamsarmax vessels, 12 Panamax vessels and 2 Handymax vessels mainly built at
shipyards in Japan. The Vessels will be acquired in a series of closings which the

25

Company expects to complete by the end of 2014. The closings are expected to occur on a vessel-by-vessel basis, in general upon reaching port after their current voyages and cargoes are discharged.

Upon completion of the Vessel Purchase Transactions, Star Bulk's position as the largest U.S listed dry bulk company will be further enhanced, with a fleet of 103 vessels on a fully delivered basis and aggregate cargo-carrying capacity of approximately 11.85 million deadweight tons.

Star Bulk expects to use cash on hand, together with borrowings under a new $231 million secured bridge loan facility extended to the Company by entities affiliated with the Company's largest shareholder, Oaktree Capital Management, L.P. (the "Oaktree Investors"), and entities affiliated with Angelo Gordon & Co. (the "Angelo Gordon Investors"), both current Excel shareholders, to pay the cash portion of consideration in the Vessel Purchase Transactions. When the Vessel Purchase Transactions are completed, and the Star Bulk shares forming part of the consideration are distributed to Excel's shareholders, the Oaktree Investors would own 57.3% of Star Bulk's outstanding shares of common stock, and the Angelo Gordon Investors would own 7.8% of Star Bulk's outstanding shares of common stock. The Vessel Purchase Transactions have been approved by the disinterested members of the Board of Directors of the Company, based upon the recommendation of a transaction committee of disinterested directors established by the Board of Directors of the Company, which considered the Vessel Purchase Transactions on behalf of the Company in coordination with the Company's management team. The total consideration for the Vessel Purchase Transactions of $634.91 million was determined based on the average of three vessel appraisals by independent vessel appraisers.

**Benefits of the Transaction, upon completion**:

- Enhances Star Bulk as the largest U.S. listed dry bulk company with a fleet of 103 vessels on a fully delivered basis with an aggregate cargo-carrying capacity of approximately11.85 million deadweight tons, including 39 Capesize and Newcastlemax vessels and 20 Kamsarmax vessels (including 14 sisterships).
- Provides greater commercial presence and additional economies of scale on technical operations.
- Increases the total market capitalization of the Company's common stock from $1.09 billion to $1.49 billion, assuming 29.917 million shares of common stock issued in the Vessel Purchase Transactions, at the August 18, 2014 closing share price of $13.12 per share.

98.    The Excel Transaction is to be completed by the end of 2014.

99.    Because the Excel Transaction was structured as the purchase of ships, and not as a merger with or acquisition of, another company or entity, Star Bulk's shareholders were never given the opportunity to vote against it.

100.    This is unfortunate, because the Excel Transaction is another conflicted transaction executed by interested, self-dealing members of the Star Bulk Board.

101.    On July 1, 2013, Excel filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. According to Excel's Amended Joint Chapter 11 Plan of Reorganization (the "Reorganization Plan"), Oaktree and its affiliated entities are secured lenders of Excel and therefore held a claim against Excel in connection with the Reorganization Plan. Indeed, entities affiliated with Oaktree hold 48.1% of the outstanding equity of Excel.

102.    Under the terms of the Reorganization Plan, Oaktree has the right to designate three members of the board of the Excel holding company entity taking Excel's assets. Upon information and belief, today Oaktree is the largest shareholder of Excel.

103.    Just as in the Oceanbulk merger, the Defendants engaged in self-dealing in order to finance the Excel Transaction. On August 19, 2014, Unity Holding LLC (a wholly-owned subsidiary of Star Bulk) entered into a Senior Secured Credit Agreement ("SSCA") with, upon information and belief, various entities affiliated with the Pappas Defendants, the Oaktree Investors, and/or the Monarch Investors.[1] The SSCA provides that the Defendants and their affiliated entities provide to Star Bulk a multiple-draw term credit facility in the aggregate

---

[1] The SSCA, which was filed with the S.E.C. as Exhibit 99.3 to a Form 6-K filed by Star Bulk on September 3, 2014, describes the SSCA as being between Unity Holding LLC and the "Initial Lenders," which the SSCA states is defined in Schedule I to the SSCA. However, no Schedule I to the SSCA was ever filed with the S.E.C.

principal amount of up to **$231 million** to be used by Star Bulk to effectuate the Excel

Transaction, with the ships associated with the Excel Transaction to be collateral for the loan.

104.    Put simply, Defendants and their affiliates loaned Star Bulk (a company in which

they hold 80.2% of the outstanding equity) $213 million to purchase ships from Excel (a

company in which they hold the majority of the outstanding equity), with the ships in question as

collateral.  This is the very definition of self-dealing.

### III.    THE SELF-DEALING SERVICE CONTRACTS

105.    In addition to approving the Oceanbulk Merger and the Excel Transaction, the

Individual Defendants have made several other business decisions that are in direct opposition to

the best interests of Star Bulk and its shareholders.

106.    Upon information and belief, Star Bulk has entered into contracts with entities

affiliated with Defendant Pappas wherein such entities provide ship maintenance services to Star

Bulk at a cost of $750 per ship, per day.  The standard cost for such services in the industry is

$250 per ship, per day.

107.    Additionally, upon information and belief, a percentage of all of the revenue from

these services is going directly to Defendant Pappas.

### CLASS ACTION ALLEGATIONS

108.    Plaintiff brings its claim for dilution as a class action, pursuant to CPLR 901 *et*

*seq*, on behalf of itself and the other Unaffiliated Shareholders of Star Bulk (the "Class").

Excluded from the Class are Defendants and any person, firm, trust corporation, or other entity

related to or affiliated with any Defendant.

109.    This action is properly maintainable as a class action.

110.   The Class is numerous enough such that joinder of all members is impracticable. Upon information and belief, there are scores of Unaffiliated Shareholders throughout the United States and around the world.

111.   Several questions of law and fact are common to the Class, including

a.   Whether the Defendants acted in such a way as to dilute Plaintiff's and the other Class members' interest in Star Bulk;

b.   Whether the dilution occurred as the result of the Oceanbulk Merger; and

c.   Whether the Oceanbulk Merger was a self-interested transaction that was not in the best interest of the Class.

112.   Defendants have acted, or refused to act, on grounds generally applicable to the Class, and are causing injury to the Class and, therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

113.   Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interest as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

114.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

29

115.    Plaintiff anticipates that there will not be any difficulty in the management of this litigation.

116.    For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of Plaintiff's dilution claim.

## FUTILITY OF DEMAND ON STAR BULK'S DIRECTORS

117.    Plaintiff brings this action derivatively in the right and for the benefit of Star Bulk to redress injuries suffered, and to be suffered, by Star Bulk as a direct result of the breaches of fiduciary duty, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.

118.    Plaintiff will adequately and fairly represent the interests of Star Bulk and its shareholders as a whole in enforcing and prosecuting its rights.

119.    Plaintiff is and was a holder of shares and/or of a beneficial interest in shares of Star Bulk valued substantially in excess of $50,000 during all times relevant to the Defendants' wrongful course of conduct alleged herein through the filing of this action.

120.    Plaintiff did not make demand pursuant to 52 Marshall Islands Revised Code § 789(c)(3) because demand on the Star Bulk Board of Directors to institute this action against the Defendants on behalf of Star Bulk would have been a futile and useless act.

121.    A majority of the members of the present board of directors of the corporation participated in, approved of, or were the beneficiaries of, the wrongful acts and conduct alleged and are themselves named as Defendants in this action.

122.    Star Bulk's present board of directors consists of the following individuals: Pappas, Capralos, Softeland, Erhardt, Schmitz, Kemp, Sourie, Stephens, and Zavvos.  Most, if

30

not all of these Directors were either on both sides of the Star Bulk-Oceanbulk merger or derived a personal financial benefit from the merger.

123.    Defendant Pappas was on both sides of the Star Bulk-Oceanbulk merger.  Pappas founded Star Bulk's predecessor, Star Maritime, and was chairman of Star Bulk.  But Pappas himself is also the face of Oceanbulk: he founded Oceanbulk Maritime S.A. and also founded the Oceanbulk Group of affiliated companies, of which the Oceanbulk Sellers were members.  As Starbulk's own proxy statement admitted, Pappas had "a financial interest in the [merger] Transactions," and he and his daughter, Milena Pappas, stood to own 12.6% of Starbulk's shares after the Merger.

124.    Nor is Erhardt an impartial member of Starbulk's board.  Erhardt leads Heron Ventures, which is a limited liability company that began as a joint venture between Pappas and others.  As part of the merger transactions, Star Bulk agreed to acquire two vessels from Erhardt's Heron Ventures company, and Oceanbulk agreed to oversee Heron's windup and dissolution.  As a result, not only do  Erhardt's business connections with Pappas preclude his impartiality, Erhardt's was also on the seller's side and benefited from Star Bulk's acquisition of the two Heron vessels.

125.    Defendant Capralos stood to earn personal financial benefits from the merger.  Prior to the merger, Capralos was Star Bulk's Chief Executive Officer and a Director.  Following the merger, Capralos became non-executive Chairman of the Board, the post previously held by Pappas, and Star Bulk became "obligated to make payments to [Mr.] Capralos . . . which would be triggered by the [merger] Transactions under his employment and consultancy arrangements with [Star Bulk]," according to the Company's June 20 Proxy.  The payments the Company has paid or agreed to pay Capralos following the merger include 168,842 shares of Star Bulk.

31

126.    Softeland and Schmitz also derived a personal financial benefit from the Merger. These two directors were designated by the Board as the so-called "independent directors" chosen to review the proposed merger transaction. After Softeland and Schmitz gave their approval, and the July 11 vote approved the merger, Star Bulk granted the two directors 15,000 restricted common shares that very day—a bonus worth more than $187,000. On information and belief, the Board's gift of shares to Softeland and Schmitz was consideration for their approval of the Oceanbulk Merger.

127.    Schmitz's prejudice in favor of the merger goes even further back from his generous merger-related bonus. In fact, Schmitz was the very progenitor of the merger, having suggested the idea to Oceanbulk's directors himself. *See* June 20 Proxy at 94. As a managing partner of Monarch Alternative Capital LP, Schmitz would have had a personal financial interest in the financial goals of Star Bulk's group of Monarch Stockholders (which were overseen by Monarch Alternative Capital). The Monarch Stockholders, in turn, entered into agreements with Oceanbulk and Pappas Entities in June 2014. Such agreements helped advance the already well-developed connections, whether in existing joint ventures or other "business relationships", between Monarch and Pappas. *See id.* at 104. Schmitz's rubber-stamping of the Star Bulk-Oceanbulk merger helped to ensure that his company, Monarch, could continue to reap the benefits of warm relations with Pappas and his allies.

128.    Defendants Shourie, Stephens, and Kemp are far from impartial Star Bulk board members either. On the contrary, these three directors are three of Oaktree's designated directors to Starbulk's board, and they were promised their seats on the condition that the merger be successfully completed. Having each spent years on Oaktree's management, these three director maintain a loyalty to their employer, Oaktree, which stood to gain a disproportionate share of

stock and influence in post-merger Star Bulk.  Even the pre-merger Board recognized that
Oaktree's economic interests in Oceanbulk and the Pappas Entities merited the designation of
Oaktree as an "Affiliated Party" to the transaction.  Furthermore, Oaktree's orchestration of the
Excel Transaction will result in Oaktree gaining additional shares in Star Bulk while also
providing the opportunity for cash to Excel's secured creditors—including Oaktree first and
foremost.  Therefore, neither Shourie, Stephens, nor Kemp, as Oaktree's named directors to Star
Bulk's board, could be said to be impartial on the question of the Oceanbulk Merger or the Excel
Transaction.

129.    Defendant Zavvos also shares interests with the merger's architects.  Zavvos is the
founder and Chief Executive Officer of Zeus Capital Partners, L.P. ("Zeus"), a private equity real
estate fund.  Defendants Zavvos and Pappas both serve as directors of Zeus.  Zavvos and Pappas
also both serve on the board of directors of West Invest AG, another private equity fund.
Zavvo's established relationships and shared business interests with Petros Pappas mean that he
cannot be said to be impartial on any of the transactions that benefited the Pappas Family or
Entities

## FIRST CAUSE OF ACTION

### Derivative Claim Against Individual Defendants for Breach of Fiduciary Duty

130.    Plaintiff incorporates by reference and realleges each and every allegation set
forth herein.

131.    The Individual Defendants breached their fiduciary duties of loyalty and good
faith to Star Bulk and/or aided and abetted breaches of fiduciary duties owed to Star Bulk by
others.

132.    As a direct result of the Defendants' conduct, Star Bulk has suffered damages (a) in the value of shares issued based on an inflated value of the assets acquired in the Oceanbulk Merger or issued to reward Individual Defendants for their role in these breaches; (b) the purchase of shipping vessels from a bankrupt Excel; (c) the excessive prices paid to Pappas-related entities for ship maintenance, and (d) has suffered and will continue to suffer damage to its ability to raise needed capital of a commercially reasonable cost, to its reputation, and goodwill.

## SECOND CAUSE OF ACTION

### Derivative Claim Against All Other Defendants for Aiding and Abetting the Breach of Fiduciary Duty

133.    Plaintiff incorporates by reference and alleges each and every allegation set forth herein.

134.    In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and/or conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

135.    Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing. The Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged

34

to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## THIRD CAUSE OF ACTION

### Derivative Claim Against the Individual Defendants for Corporate Waste

136.   Plaintiff incorporates by reference and alleges each and every allegation set forth herein.

137.   The Individual Defendants' conduct in approving the Oceanbulk Merger and the Excel Transaction -- both conflicted, self-dealing transactions in which the Individual Defendants caused Star Bulk to overpay for troubled entities – constitutes a waste of corporate assets because Star Bulk did not benefit from the improper transactions.

138.   As a direct and foreseeable result of the Individual Defendants' waste of corporate assets, Star Bulk has been damaged in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### Direct Claim on Behalf of Plaintiff and the Class Against all Defendants for Dilution

139.   Plaintiff incorporates by reference and alleges each and every allegation set forth herein.

140.   The Defendants' conduct as described above resulted in the dilution of Plaintiff's interest in Star Bulk.

141.   As a result of the Oceanbulk Merger and the Excel Transaction, both of which were self-dealing actions on the part of an interested, conflicted Board, the interest of Plaintiff in Star Bulk has been diluted and the interest of the Defendants has been increased.

142.   As a direct and foreseeable result of the Defendants' dilution of Plaintiff's interest in Star Bulk, Plaintiff has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

a)   Cancellation of some or all shares issued to Defendants as part of the Oceanbulk Merger transactions or after closing as compensation for Defendants' role in the Merger;

b)   Damages in the amount determined by the jury at trial to compensate Star Bulk for harm suffered to its ability to raise capital of a commercially reasonable cost or to attract new investors and to its reputation and goodwill;

c)   Strengthen the Company's corporate governance by replacing some or all directors so that a majority or substantial percentage of the Board members have no connections to the Defendants, particularly the Preferred Shareholder Blocks;

d)   Replace Pappas with a new CEO who has not engaged in any wrongful conduct related to the Oceanbulk Merger;

e)   Awarding to Plaintiff reasonable and necessary attorneys' fees and litigation costs for prosecuting this action;

f)   Requiring the Defendants to reimburse the Company for the award of any such attorneys' fees and litigation costs to Plaintiff for prosecuting this action;

g)   Awarding Plaintiff pre-judgment and post-judgment interest on any damages at the statutory rate; and

h)   Granting such other and further relief as the Court deems appropriate.

36

Dated:  October 23, 2014

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: /s/ Benjamin Y. Kaufman

Mark C. Rifkin
Benjamin Y. Kaufman
Lydia Keaney Reynolds
270 Madison Avenue
New York, New York 10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653

*Counsel for Plainitff*

*Of Counsel:*

**SMYSER KAPLAN &
   VESELKA, L.L.P.**
Larry R. Veselka
Tyler G. Doyle
Hector R. Chavez
700 Louisiana Street, Suite 2300
Houston, Texas 77003
Tel: (713) 221-2356
Fax: (713) 221-2320

*Counsel for Plainitff*

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

F5 CAPITAL, A CAYMAN ISLANDS
CORPORATION,

          Plaintiff,

            v.

PETROS PAPPAS; MILENA MARIA PAPPAS;
ROGER SCHMITZ; TOM SOFTELAND;
SPYROS CAPRALOS; KOERT ERHERDT;
RENEE KEMP; RAJATH SOURIE; EMILY
STEPHENS; STELIOS ZAVVOS; OAKTREE
VALUE OPPORTUNITIES FUND, L.P.,
OAKTREE OPPORTUNITIES FUND IX
DELAWARE, L.P., OAKTREE CAPITAL
MANAGEMENT, L.P., OAKTREE
OPPORTUNITIES FUND IX (PARALLEL 2),
L.P., MONARCH ALTERNATIVE SOLUTIONS
MASTER FUND LTD., MONARCH CAPITAL
MASTER PARTNERS II-A LP, MONARCH
CAPITAL MASTER PARTNER II LP,
MONARCH DEBT RECOVERY MASTER FUND
LTD., MONARCH OPPORTUNITIES MASTER
FUND LTD., P MONARCH RECOVERY LTD.,
STAR SYNERGY LLC; STAR OMAS LLC;
OAKTREE CAPITAL MANAGEMENT LP;
OAKTREE OBC HOLDINGS LLC; OAKTREE
DRY BULK HOLDINGS LLC; MILLENNIA
LLC; MILLENNIA HOLDINGS LLC; MIRABEL
SHIPHOLDING & INVEST LIMITED; MIRACH
SHIPPING COMPANY LIMITED; BLUESEA
OCEANBULK SHIPPING LLC; HERON
VENTURES LTD.; and OCEANBULK
CARRIERS LLC,

          Defendants.

     -and-

STAR BULK CARRIERS CORP.,

          Nominal Defendant

No. 14 Civ. _____

**DECLARATION OF
GEORGIA MASTAGAKI IN
SUPPORT OF NOTICE OF
REMOVAL**

Removed from the Supreme
Court of the State of New York,
Index No. 653237/2014.

GEORGIA MASTAGAKI declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.   I am over the age of eighteen, have personal knowledge of the facts contained in this Declaration, and am competent in all ways to testify thereto if called as a witness.

2.   I am currently the Co-General Counsel of Star Bulk since July 2014.  of Star Bulk Carriers Corp.  ("Star Bulk").  Before then, I held the position of General Counsel from 2008..

3.   Earlier this year, Star Bulk acquired Oceanbulk Shipping L.L.C.  and other entities (the "Oceanbulk Merger") and subsequently engaged in certain other transactions.  The Oceanbulk Merger closed on July 11, 2014.

4.   Star Bulk is traded on the NASDAQ exchange under the ticker symbol "SBLK."  I have reviewed certain of our records of shareholders.  As of June 17, 2014, the record date for the Oceanbulk Merger, and August 28, 2014, the record date for Star Bulk's 2014 Annual General Meeting, there were more than 7,000 shareholders who were unaffiliated with any defendants[1] in the above-captioned action.

5.   In connection with the Oceanbulk Merger, several defendants in the above-captioned action were issued at least several million shares of Star Bulk common stock.

6.   As of July 11, 2014, the date on which the Oceanbulk Merger closed, Star Bulk common stock closed at $12.03 per share.

---

[1]   Star Bulk is not aware of any entity with the name of purported defendant "Bluesea Oceanbulk Shipping LLC."

2

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 4, 2014.

Georgia Mastagaki

SK 25767 0007 6249855