WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

FOUNDED 1888

270 MADISON AVENUE
NEW YORK, NY 10016
212-545-4600

SYMPHONY TOWERS
750 B STREET - SUITE 2770
SAN DIEGO, CA 92101

625 NORTH FLAGLER DRIVE
WEST PALM BEACH, FL 33401

MARK C. RIFKIN
212-545-4762
FAX 212-545-4653
rifkin@whafh.com

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
55 WEST MONROE STREET, SUITE 1111
CHICAGO, IL 60603

January 26, 2015

**VIA ECF and EMAIL**

Honorable Analisa Torres
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

    Re:    *F5 Capital v. Pappas, et al.*, No. 1:14-cv-09365-AT

Dear Judge Torres:

We write on behalf of Plaintiff F5 Capital ("F5") pursuant to Section III.A of Your Honor's Individual Rules of Practice in Civil Cases in response to the January 16, 2015, letter from Andrew J. Ehrlich, Esquire, to set forth the bases for F5's opposition to Defendants' anticipated motion to dismiss the Complaint. Counsel for the parties have exchanged pre-motion letters as required by Your Honor's Individual Practice Rule III.B. Defendants have cited no controlling authority that supports dismissal of the Complaint.

**I.    BACKGROUND**

In this shareholder action, F5 asserts derivative claims brought under N.Y. Bus. Corp. Law § 626 on behalf of Star Bulk Carriers Corp. ("Star Bulk" or the "Company"), as well as direct claims on its own behalf against the Star Bulk Board of Directors (the "Board") for breach of fiduciary duty and against certain related entities owning or controlling 81.3% of Star Bulk's shares. Defendants have engaged in three self-serving transactions and agreements that benefit only them, not Star Bulk or its minority shareholders not affiliated with tthe defendants. The first interested transactions is the acquisition by Star Bulk of entities affiliated with the Oaktree and Pappas Family defendants and some of the other individual defendants at a grossly inadequate and unfair price ubder terms that also resulted in the dilution of Star Bulk's non-controlling shareholders in favor of those defendants (the "Oceanbulk Merger"). The other interested transaction is the purchase of 34 drybulk vessels from Excel Maritime Carriers Ltd. ("Excel") (the "Excel Transaction"), another entity affiliated with the Oaktree defendants and some of the individual defendants, for a grossly excessive and unreasonable price. The third self-interested transaction is a series of service contracts that Star Bulk entered into with entities affiliated with



Wolf Haldenstein Adler Freeman & Herz LLP

**VIA ECF and EMAIL**
Honorable Analisa Torres
January 26, 2015
Page 2

Mr. Pappas and Mr. Erhardt, another individual defendant, which require Star Bulk to pay almost *three times* the standard industry price for services from those entities

II. **BASES FOR OPPOSING DEFENDANTS' MOTION TO DISMISS**

   A. **The Complaint Adequately Alleges Demand Futility and that the Challenged Transactions Are Not Subject to the Business Judgment Rule**

Defendants have not disputed the well-settled principle that a derivative plaintiff is not required to make a pre-suit demand on the corporation's board of directors where the complaint alleges facts creating "a reasonable doubt . . . that (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Rosenquist v. Economou*, Sup. Ct. Case No. 2010-002, slip op. at 11 (Rep. Marshall Islands Oct. 3, 2011) (quoting *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1985); *see also* Fed. R. Civ. P. 23.1.[1] The Complaint easily meets these pleading criteria.

*First*, the Complaint alleges a litany of facts that make demand upon the board entirely futile and useless. As F5 alleges, a majority of the directors participated in, approved of, or were the beneficiaries of the acts about which F5 complains. For example, Petros Pappas, chairman of the board of Star Bulk and founder and CEO of Oceanbulk, had a financial interest in and was on both sides of the Oceanbulk merger. Even Star Bulk's proxy material regarding the merger admitted that Mr. Pappas had a "financial interest in the Transactions" as well as his daughter Milena Pappas. Compl. ¶ 123. Koert Erhardt was President of Oceanbulk before the merger and was made President of Star Bulk afterwards and also benefitted from having his own company sell two vessels to Star Bulk as part of the merger. Compl. ¶ 124. Star Bulk became obligated to make substantial financial payments to Spyros Capralos, the Star Bulk CEO replaced as CEO by Petros Pappas after the merger, that were triggered by the merger transactions. Compl. ¶ 125. Rajath Shourie, Emily Stephens, and Renee Kemp ("Oaktree Directors") are Oaktree employees who received their seats on the board as Oaktree designees pursuant to the Oceanbulk merger. The Oaktree Directors were appointed to the board on July 11, 2014, the same day Star Bulk claims that the transaction was approved by an undisclosed majority of supposedly non-interested shareholders. Although the proxy said that the transactions could take months to close, Star Bulk claims that it was closed on the same day as the vote approving the merger. The

---

[1] Marshall Islands law, where Star Bulk is incorporated, governs this case. *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 128 (S.D.N.Y. 1999) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)). On corporate matters, the Marshall Islands has adopted Delaware's decisional law. *See* Marshall Islands Business Corporation Act § 13 ("Insofar as it does not conflict with any other provision of this Act, the non-statutory law of the State of Delaware and those of other states with substantially similar legislative provisions is hereby declared to be and is hereby adopted as the law of the Republic.").

**VIA ECF and EMAIL**
Honorable Analisa Torres
January 26, 2015
Page 3

Oaktree Directors were conflicted in considering matters thereafter including matters consummating the Oceanbulk Merger and the Excel Transaction, by their duty to Oaktree, which stood on the opposite side of both transactions. Compl. ¶ 128.

In addition, the two directors who served on the so-called Special Committee, Messrs. Softeland and Schmitz, were not disinterested and were promised and awarded additional stock worth more than $187,000 as a result of the merger's approval. Compl. [paragraphs symbol] 126 and 127.

These relationships regarding the six director defendants specifically addressed in Mr. Ehrlich's letter are far more than mere business or personal relationships, which might not render the related directors disinterested. *See In re Sanchez Energy*, 2014 Del. Ch. LEXIS 239, at *20 (Del. Ch. Nov. 25, 2014). Rather, the relationships relate directly to the challenged transactions and pervade the board, thus rendering the entire board interested. *See, e.g., In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 581-82 (Del. Ch. 2007) (demand is futile when the entire board will "receive a personal financial benefit from the transaction that is not equally shared by the stockholders" and entire board is implicated in related-party transactions). Under these circumstances and the others alleged in the Complaint, it was impossible for the board to make a disinterested decision on any demand from F5 or any other similarly injured minority shareholder.

*Second*, the Complaint alleges that the transactions in question were not the product of a valid exercise of business judgment. The self-dealing Oceanbulk merger, for example, was consummated on grossly inadequate and unfair terms, and has plunged Star Bulk deeply into debt. Some of the Oaktree and Pappas defendants loaned more than $415 million to Oceanbulk, the entire amount of which was subsequently converted into Oceanbulk equity on undisclosed terms and then exchanged for Star Bulk shares in the merger. Compl. ¶ 67. The merger imposed on Star Bulk an additional $1.3 billion in debt from Oceanbulk, and required Star Bulk to raise more than $600 million more capital on top of that to meet Oceanbulk's shipbuilding contractual commitments. Compl. ¶ 88. In the exchange, Defendants caused Star Bulk to agree to more than $280 million in upward adjustments to the value of Oceanbulk, which lost $20 million in the 18 months before the merger. Compl. ¶ 90. The Excel transaction, which was never approved by the shareholders, is equally unfair to Star Bulk. Defendants caused Star Bulk to acquire thirty-four vessels at inflated prices from Excel, which was then bankrupt. Compl. ¶ 101. Oaktree is Excel's largest shareholder. Compl. ¶ 101. Through a wholly-owned subsidiary, Star Bulk borrowed $231 million from entities affiliated with Mr. Pappas and/or Oaktree to complete the Excel transaction. Compl. ¶ 103. In addition, defendants have caused Star Bulk to pay entities affiliated with Mr. Pappas and Mr. Erhardt for maritime services at a rate of $750 per ship per day, which is three times higher than the standard cost of $250 per ship per day for the same services. This sweetheart deal applies to vessels acquired in the Excel transaction as well as the Oceanbulk Merger. Compl. ¶ 105.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

**VIA ECF and EMAIL**
Honorable Analisa Torres
January 26, 2015
Page 4

### B.     F5's Dilution Claim Should Not Be Dismissed

F5's dilution claim is not a derivative claim. To the contrary, while dilution claims may be derivative in some circumstances, under the analysis required by *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), they are not derivative in all cases. In *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006), the Delaware Supreme Court held that that dilution may be pled as a direct claim when the plaintiff shows that (1) a stockholder or controlling group of stockholders caused the corporation to issue an excessive number of shares in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange caused an increase in the percentage of the outstanding shares owned by the controlling stockholder or group and a corresponding decrease in the percentage owned by the minority shareholders. That is exactly what F5 alleges here: that Star Bulk was and is controlled by interested and conflicted directors who entered into the Oceanbulk merger on grossly unfair terms and by the Oaktree, Pappas, and Monarch defendants controlling those directors. The value adjustments made to the value of the assets involved in the Oceanbulk Merger were heavily skewed in favor of Oceanbulk despite its history of operating losses. As a result of the merger, shareholders affiliated with Monarch, Oaktree, and Mr. Pappas increased their combined ownership of the outstanding shares of Star Bulk from 43.9% pre-Merger to a whopping ***80.2%*** post-Merger. Compl. ¶ 3. The non-affiliated, disinterested shareholders saw their shares dramatically reduced. Under these circumstances, the dilution claims in this case are properly asserted as direct claims. Even if not direct, Plaintiffs should be allowed to amend to assert those claims derivatively.

### C.     The Corporate Waste Claim Should Not Be Dismissed

Defendants are incorrect that the values Star Bulk paid in the subject transactions were not so irrational that no reasonable person could conclude that the transactions made sense. To the contrary, the Oceanbulk Merger, the Excel Transaction, and the Service Contracts were fraught with self-dealing by defendants and were consummated on terms that are demonstrably unfair to Star Bulk. Further, the maritime Service Contracts to entities controlled by or benefitting Mr. Pappas and Mr. Erhardt are at rates three times higher than the prevailing industry standard without any justification or explanation and thus the very definition of corporate waste. As alleged in the Complaint, the consideration received by Star Bulk for its newly issued shares or other consideration was "so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000). As alleged in the Complaint, the Oceanbulk Merger, Excel Transaction, and the Service Contracts were "exceptionally one sided," and thus constitute actionable corporate waste. *White v. Panic*, 783 A.2d 543, 554 (Del. 2001). Defendants try to put some lipstick on the pig by referring in their footnote 3 to the changes in Star Bulk's share price even though the share price has fallen from above $11 at the time of the Oceanbulk Merger to $4.15 on January 23, 2015.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

**VIA ECF and EMAIL**
Honorable Analisa Torres
January 26, 2015
Page 5

### D.   F5 Is A Proper Derivative Plaintiff

Finally, defendants are incorrect that F5 is not a proper derivative plaintiff. The standing requirement for a derivative action is met when the plaintiff has been a *beneficial* owner of the company's shares continuously during the period of wrongdoing and for the duration of the litigation. The plaintiff need not be the legal owner of the shares. *Parfi Holding AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 939, 2008 Del. Ch. LEXIS 124, 75, 2008 WL 4110698 (Del. Ch. 2008). F5 has been at least a *beneficial* owner of Star Bulk shares since at least 2012 – this has not been disputed by RBS Securities, Inc. ("RBSSI") in the litigation now pending in the District of Connecticut, *F5 Capital v. RBS Securities, Inc., et al.*, No. 14-cv-1469 (D. Conn.). In that action which F5 sought, *inter alia*, return of physical possession of the share certificate to F5.[2] Defendants have not cited any authority, and we are not aware of any, requiring that a derivative plaintiff must be in *physical* possession of share certificates to have standing. Likewise, defendants' argument that Mr. Su, F5's shareholder, is pursuing some unspecified "personal agendas" and therefore F5 is disqualified as a derivative plaintiff, is equally unavailing. In *Meimaris ex rel. B+H Ocean Carriers v. Hudner*, 1995 U.S. Dist. LEXIS 9676, at *2 (S.D.N.Y. July 12, 1995), the district court found the plaintiff (a former employee of the nominal defendant) was inadequate because he was employed by a business that competed directly with the nominal defendant and which was formed with the plaintiff's help while he was still employed by the nominal defendant. Here, it is some of the *defendants, not F5,* who are engaged in businesses competing with the Company. Further, defendants' argument that F5 is pursuing Mr. Su's "personal agendas" is sheer speculation beyond the allegations of the Complaint. Whether Mr. Su, a former director and co-chairman of Star Bulk, will be deemed a credible witness is a matter for this Court to decide in the context of the trial of this case, not for some other court in a different context.[3] *Cf. Zemel Family Trust v. Phillips Int'l Realty Corp.*, 205 F.R.D. 434, 437 (S.D.N.Y. 2002), (finding plaintiff to be an inadequate class representative because of false testimony he gave *in that case*). Mr. Su has not testified in this case at all, and there is no basis for the Court to find the corporate entity F5 inadequate on that basis.

---

[2] A new share certificate different from the one tendered to an RBSSI affiliate has already have been returned to F5. The issues remaining in that litigation are claims for conversion, civil theft, negligence, replevin, and accounting based on questions of RBSSI's lack of authority to possess, much less exercise voting control over, receive dividends on, or have the shares registered in the name of anyone other than F5.

[3] Defendants' only reference to support this accusation is a foreign judgment that is subject to a pending appeal.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

**VIA ECF and EMAIL**
Honorable Analisa Torres
January 26, 2015
Page 6

      We are prepared to address these issues on February 5, 2015, during the initial pretrial conference.

Respectfully yours,

Mark C. Rifkin

MCR/772715

cc:    All counsel (by ECF and email)