**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

F5 CAPITAL, A CAYMAN ISLANDS
CORPORATION,

                                Plaintiff,

             -against-

PETROS PAPPAS, *et al.*,

                          Defendants,

             -and-

STAR BULK CARRIERS CORP.,

                 Nominal Defendant.

No. 14-cv-09356 (AT) (MHD)

Oral Argument Requested

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION <u>TO ALL DEFENDANTS' JOINT MOTION TO DISMISS</u>

Dated:  April 17, 2015

Mark C. Rifkin
Benjamin Y. Kaufman
Lydia Keaney Reynolds
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Ave.
10th Floor
New York, NY  10016
(212) 545-4600

*Attorneys for Plaintiff F5 Capital*

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES.................................................................................. ii

INTRODUCTION .............................................................................................1

FACTUAL BACKGROUND.................................................................................2

      A.     The Three Self-Dealing Transactions .................................................2

      B.     Defendants' Rampant Conflicts and Self-Dealing.................................3

LEGAL ARGUMENT .......................................................................................5

I.      PLAINTIFF WAS EXCUSED FROM MAKING A PRE-SUIT  DEMAND UPON THE BOARD ...............................................................................................5

      A.     Pre-Suit Demand Under Federal Rule 23.1 and Delaware Law ...........................5

      B.     Pre-Suit Demand Upon the Board Would Have Been Futile ................................8

            1.     The Self-Dealing Oceanbulk Merger .......................................9

            2.     The Self-Dealing Excel Transaction .......................................11

            3.     The Self-Dealing Maritime Service Contracts to Pappas ........................12

II.     THE CHALLENGED TRANSACTIONS WERE NOT  THE RESULT OF ADEQUATE BUSINESS JUDGMENT ...............................................................................12

III.    PLAINTIFF'S CLAIM FOR DILUTION IS DIRECT, NOT DERIVATIVE................15

IV.    THE COLLATERAL ATTACK ON MR. SU'S CREDIBILITY DOES NOT RENDER PLAINTIFF INADEQUATE AS A REPRESENTATIVE OF THE COMPANY OR THE CLASS ...............................................................................................18

CONCLUSION................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>**                                                                                    **<u>Page(s)</u>**

*In re Abbott Laboratories Derivative Shareholders Litigation,*
  325 F.3d 795 (7th Cir. 2003) .................................................................... 7, 8, 10

*American International Group, Inc. v. Greenberg,*
  965 A.2d 763 (Del. Ch. 2008) .......................................................................... 8, 10

*Aronson v. Lewis,*
  473 A.2d 805 (Del. 1984),
  *both overruled in part on other grounds, Brehm v. Eisner,* 747 A.2d 244 (Del. 2000)...... *passim*

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................. 5

*Blaustein v. Lord Baltimore Capital Corp.,*
  84 A.3d 954 (Del. 2014)........................................................................................ 6

*Buckley v. O'Hanlon,*
  C.A. No. 04-955 (GMS), 2007 U.S. Dist. LEXIS 22211 (Del. Ch. Mar. 28, 2007)................. 8

*Feldman v. Cutaia,*
  956 A.2d 644, 655 (Del. Ch. 2007),
  *aff'd,* 951 A.2d 727 (Del. 2008)........................................................................ 16

*Gentile v. Rossette,*
  906 A.2d 91 (Del. 2006)........................................................................................ 16

*Grimes v. Donald,*
  673 A.2d 1207 (Del. 1996),
  *overruled in part on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del. 2000) ..................... 6

*Grobow v. Perot,*
  539 A.2d 180 (Del. 1988),
  *overruled in part on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del. 2000)................. 6

*Klauber Brothers v. Bon-Ton Stores, Inc.,*
  557 F. App'x 77 (2d Cir. 2014) ........................................................................... 5

*Kramer v. Western Pacific Industries, Inc.,*
  546 A.2d 348 (Del. 1988)..................................................................................... 16

*Levine v. Smith,*
  591 A.2d 194 (Del. 1991).......................................................................................6

*In re Massey Energy Co. Derivative and Class Action Litigation,*
   C.A. No. 5430-VCS, 2011 Del. Ch. LEXIS 83 (Del. Ch. May 31, 2011) ................................ 8

*MBIA Inc. v. Federal Insurance Co.,*
   652 F.3d 152 (2d Cir. 2011) ................................................................................ 5

*Michelson v. Duncan,*
   407 A.2d 211 (Del. 1979) .................................................................................. 13

*In re Oxford Health Plans, Inc. Securities Litigation,*
   192 F.R.D. 111 (S.D.N.Y. 2000) ................................................................... 7, 8, 12

*Pension Benefit Guaranty Corp. v.  Morgan Stanley Investment Management,*
   712 F.3d 705 (2d Cir. 2013) ................................................................................ 5

*Pogostin v. Rice,*
   480 A.2d 619 (Del. 1984) ................................................................................... 7

*Rales v. Blasband,*
   634 A.2d 927 (Del. 1993) ................................................................................... 6

*Rosenquist  v. Economou,*
   No. 2010-002, slip op. at 10 (Sup. Ct. Marshall Islands Oct 3, 2011) ................................. 15

*Saito v. McCall,*
   17132-NC, 2004 Del. Ch. LEXIS 205 (Del. Ch. Dec. 20, 2004),
    *overruled in part on other grounds by Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010) ........ 8, 10

*San Diego County Employees Retirement Association v. Maounis,*
   749 F. Supp. 2d 104 (S.D.N.Y. 2010) ................................................................... 15

*Stanich v. Travelers Indemnity Co.,*
   259 F.R.D. 294 (N.D. Ohio 2009) ........................................................................ 18

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
   845 A.2d 1031 (Del. 2004) ................................................................................ 16

*Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.,*
   936 F. Supp. 2d 376 (S.D.N.Y. 2013) ..................................................................... 6

*In re Walt Disney Co. Derivative Litigation ("Disney I"),*
   825 A.2d 275 (Del. Ch. 2003) ........................................................................... 6, 7

*In re Walt Disney Co. Derivative Litigation ("Disney II"),*
   906 A.2d 27 (Del. 2006) ............................................................................... 13, 14

iii

## STATUTES & RULES

Federal Rules of Civil Procedure
  12(b)(6)..................................................................................................................................5
  23.1..........................................................................................................................................5
  23.1(b)(3)................................................................................................................................5

New York Business Corporation Law ("BCL")
  § 626........................................................................................................................................1

Plaintiff, F5 Capital ("F5"), by and through its attorneys, hereby submits this Memorandum of Law in Opposition to All Defendants' Joint Motion to Dismiss.

## INTRODUCTION

Plaintiff F5 is one of the largest shareholders of Nominal Defendant Star Bulk Carriers Corp. ("Star Bulk" or the "Company") who are not affiliated with any of the Defendants in this action. *See* Compl. ¶¶ 4, 119. The Defendants[1] collectively own more than 80 percent of the outstanding shares of Star Bulk and unquestionably control the Company. Compl. ¶ 3. In this shareholder action, Plaintiff asserts both derivative claims under N.Y. Bus. Corp. Law § 626 on behalf of Nominal Defendant Star Bulk and class claims to recover damages for all Star Bulk shareholders not affiliated with Oaktree, the Pappas Defendants, or Monarch (the "Unaffiliated Shareholders") (the "Class"), caused by Defendants' wrongdoing in orchestrating three corporate transactions for their own benefit and to the great detriment of Star Bulk and the Class members.

All Defendants have jointly moved to dismiss the Complaint, principally on the basis that F5 failed to make a pre-suit demand upon Star Bulk's Board of Directors, essentially requesting that the Individual Defendants sue themselves and their confederates for the massive damage they have caused to Star Bulk and its unaffiliated shareholders. Under Delaware law (which the parties agree applies) when a majority of a company's directors actively participated in the alleged wrongdoing, and thus are conflicted by self-interest, pre-suit demand upon the board is excused as futile. This common-sense law applies fully here. Plaintiff was not required to make a futile demand upon the Board to sue themselves and their partners in wrongdoing before commencing suit, and Plaintiff's failure to make that futile demand is no defense to the derivative claims.

---

[1] Unless otherwise indicated, all capitalized terms have the meanings set forth in the Complaint.

In classic "blame-the-victim" style, much of Defendants' argument is devoted to a vitriolic *ad hominem* attack upon the owner of Plaintiff F5, Hsin Chi Su.  In addition to F5 and several other companies, Mr. Su owns the Taipei-based shipping company Today Makes Tomorrow ("TMT"), formerly Taiwan Maritime Transportation.  Mr. Su is one of Asia's leading maritime executives.  Mr. Su holds several patents for improvements to liquefied natural gas and oil tanker construction, mobile data transmission technology, and a shipping tracking system.  To be sure, like many other high-profile entrepreneurs, Mr. Su has seen his share of litigation.  And as is common in complex litigation, any preliminary and intermediate appellate rulings against Mr. Su are subject to review and reversal.  None of that has ***anything*** to do with the merits of Plaintiff's claims in this case or with whether those claims should be dismissed on the pleading technicalities that Defendants have thrown at Plaintiff.

As shown below, under well-settled Delaware law, Plaintiff should be permitted to proceed with his derivative claims without being required to make a futile pre-suit demand upon the Board to sue themselves and their accomplices.  Likewise, under well-settled Delaware law, Plaintiff should be permitted to proceed with his class claim for dilution of the unaffiliated shareholders' interest in Star Bulk.

## FACTUAL BACKGROUND

### A.    The Three Self-Dealing Transactions

The three self-dealing transactions contrived, planned, and executed by the Defendants for their own benefit are as follows:  (i) Star Bulk's purchase of Oceanbulk Carriers LLC ("Oceanbulk"), which resulted in a merger with and acquisition of entities affiliated with the Individual Defendants[2] at a grossly excessive and unfair price and terms (the "Oceanbulk

---

[2] The Individual Defendants, all of whom are members of Star Bulk's Board of Directors (the "Board"), are: Petros Pappas ("Pappas"), Milena Maria Pappas ("Milena Pappas"), Roger

Merger"); (ii) Star Bulk's purchase of 34 drybulk vessels from Excel Maritime Carriers Ltd. ("Excel"), another entity affiliated with the Individual Defendants, also on grossly excessive and unfair terms (the "Excel Transaction"); and (iii) Star Bulk entering into service contracts with entities affiliated with the Individual Defendants in which Star Bulk is required to pay almost three times the standard industry price for such services.  Compl. ¶ 5.

These three self-dealing transactions, which were entered into for the benefit of the Defendants and to the detriment of the Company and its unaffiliated shareholders, wasted hundreds of millions of dollars of Star Bulk's assets and also resulted in a massive dilution of the Class members' interest in Star Bulk.  *See, e.g.,* Compl. ¶¶ 2-4, 86-90, 104, 106-07.  Indeed, solely as a result of the Oceanbulk Merger, the Oaktree Investors, the Monarch Investors, and the Pappas Defendants and their affiliated entities have increased their combined ownership of the outstanding shares of Star Bulk from just 43.9% pre-merger to a whopping 80.2% post-merger. Compl. ¶ 3.

### B.    Defendants' Rampant Conflicts and Self-Dealing

In all three transactions, rampant conflicts and self-dealing abound.  For example, the Oceanbulk Merger was conceived of by Defendant Roger Schmitz, who was hand-picked by Defendant Monarch to sit on Star Bulk's Board.  Compl. ¶¶ 68-69.  Prior to the merger, Monarch and its affiliates owned 21% of Star Bulk's common stock.  Compl. ¶ 69.  Schmitz also shares substantial corporate interests with the Oaktree Defendants as well.  Compl. ¶ 70.  Defendant Schmitz controlled the negotiating process for the Oceanbulk Merger (Compl. ¶ 71) and oversaw approval of the transaction, serving as one of only two members of the purportedly independent

---

Schmitz ("Schmitz"), Tom Softeland ("Softeland"), Spyros Capralos ("Capralos"), Koert Erherdt ("Erherdt"), Renee Kemp ("Kemp"), Rajath Sourie ("Sourie"), Emily Stephens ("Stephens"), and Stelios Zavvos ("Zavvos").  *See* Compl. ¶¶ 13-24.

"Special Committee" that was appointed to review his deal. Compl. ¶ 79.

The Oceanbulk Merger – in which Star Bulk purchased a company that had not turned a profit – was devised to benefit the Oaktree Defendants, the Pappas Defendants, and the Monarch Defendants. Compl. ¶ 90. Collectively, these Defendants increased their ownership of Star Bulk from 43.9% pre-merger to a massive 80.2% post-merger, giving themselves complete control over Star Bulk. Compl. ¶¶ 4, 89. According to the Star Bulk Proxy Statement for the merger issued on June 20, 2014, the Pappas Defendants and entities they controlled loaned more than $415 million to Oceanbulk as part of the transaction. On May 28, 2014, the loan was converted into equity on secret terms never disclosed to the Unaffiliated Shareholders. Compl. ¶ 67. The Oceanbulk Merger piled $1.3 billion of new debt on Star Bulk and committed the Company to raise *another* $614 million in capital. Compl. ¶¶ 86-88.

The Excel Transaction was equally tainted by conflict and self-dealing. The Pappas Defendants, the Oaktree Investors, and the Monarch Investors provided $231 million in financing to Star Bulk to buy 34 drybulk ships from a bankrupt seller. Compl. ¶ 101. The loan is secured by first mortgages on the ships. Compl. ¶ 103. The Excel Transaction allowed Oaktree, Excel's largest creditor, to improve its security position and chance of repayment on the debt it previously extended to Excel. Compl. ¶ 104.

Finally, Star Bulk has entered into contracts with entities affiliated with Defendant Pappas for ship maintenance services to Star Bulk at a cost of $750 per ship, per day. Compl. ¶ 106. However, the standard cost for maritime services is just $250 per ship, per day – just one-third the price that Pappas effectively agreed to pay himself. *Id.*

4

## LEGAL ARGUMENT

I. **PLAINTIFF WAS EXCUSED FROM MAKING A PRE-SUIT DEMAND UPON THE BOARD**

### A.   Pre-Suit Demand Under Federal Rule 23.1 and Delaware Law

All the Defendants have moved to dismiss the Complaint because Plaintiff did not make a pre-suit demand upon the Board before commencing this action.  When the plaintiff in a shareholder derivative action has not made a demand on the corporation's board of directors to take action the plaintiff must allege reasons for not making demand before commencing the action (*i.e.*, the reasons why a pre-suit demand is excused).  Accordingly, Rule 23.1 requires that a derivative complaint "state with particularity:  (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  Here, Plaintiff did not make a pre-suit demand upon the Board because such demand would have been futile.[3]

Although Rule 23.1 provides that the facts concerning a shareholder demand should be pleaded with particularity, as Defendants concede, the parties agree that Delaware law governs whether pre-suit demand on the Board is excused under the facts alleged in this case.  *See MBIA Inc. v. Federal Ins. Co.*, 652 F.3d 152, 163 (2d Cir. 2011).  Under Delaware law, pleading demand futility is not nearly as demanding as Defendants have argued.  A derivative plaintiff is

---

[3] In deciding a Rule 12(b)(6) motion, the Court is governed by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Under *Twombly*, a complaint should not be dismissed if it includes "enough facts to state a claim for relief that is plausible on its face."  *Twombly*, 550 U.S. at 570. The Court must assume all the allegations in the complaint are true, even if doubtful.  *Klauber Bros. v. Bon-Ton Stores, Inc.*, 557 F. App'x 77, 79 (2d Cir. 2014).  A complaint may not be dismissed if its factual allegations, assumed to be true, "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Moreover, the allegations of the complaint may not be parsed and read in isolation, but must be read as a whole.  *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 732 (2d Cir. 2013).

not required to plead evidence.  *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984), *both overruled in part on other grounds by Brehm v. Eisner*, 747 A.2d 244 (Del. 2000).  Instead, the complaint need only raise a "reasonable doubt" that the directors could consider a demand impartially.  *Aronson*, 473 A.2d at 814;[4] *Rosky*, 2009 U.S. Dist. LEXIS 107531, at *10 (applying the reasonable doubt standard).[5]  Moreover, Plaintiffs are not required to plead facts sufficient to sustain a judicial "finding."  *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003) (*"Disney I"*); *Grobow v. Perot*, 539 A.2d 180, 186, 195 (Del. 1988), *overruled in part on other grounds by Brehm*, 746 A.2d 244. Plaintiffs need not demonstrate a reasonable probability of success on the merits; rather, plaintiffs need only make a "threshold showing, through the allegation of particularized facts, that their claims have some merit."  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

Under Delaware law, a plaintiff is excused from making a pre-suit demand on a board in circumstances when he or she challenges an affirmative board act or when he challenges board inaction.  In *Aronson*, the Delaware Supreme Court held demand futility asks whether, based upon the allegations of the complaint, "the Board, at the time of the filing of the suit, could have impartially considered and acted upon the demand."  *Id.* at 809 (citations omitted).  The Delaware Supreme Court added that the derivative plaintiff "need not allege that the challenged transaction could never be deemed a product of business judgment."  *Id.*  Importantly, the protections of the business judgment rule can only be claimed by disinterested directors whose

---

[4] "Reasonable doubt" means "there is a ***reason to doubt***."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) (emphasis added), *overruled in part on other grounds by Brehm*, 746 A.2d 244. The standard "is sufficiently flexible and workable to provide the stockholder with the 'keys to the courthouse' in an appropriate case," requiring only that "the claim is not based on mere suspicions or stated in conclusory terms."  *Id.*

[5] Put another way, Delaware law requires a plaintiff to "allege with particularity that a majority of the board lacks independence or is otherwise incapable of validly exercising its business judgment."  *Blaustein v. Lord Baltimore Capital Corp.*, 84 A.3d 954, 958 (Del. 2014).

conduct otherwise meets the test of business judgment, which means, at a minimum, that the directors cannot "appear on both sides of the transaction nor expect to derive any personal financial benefit from it." *In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 116 (S.D.N.Y. 2000) (quoting *Aronson*, 473 A.2d at 812).

Where, as here, the derivative plaintiff challenges an affirmative act of the board, he must plead sufficient facts creating reasonable doubt that the challenged decision was: (1) the act of a majority of independent or disinterested directors; *or* (2) the valid exercise of business judgment. *See Aronson*, 473 A.2d at 812.  If either prong of the *Aronson* test is met, demand is excused. Under the first prong of the *Aronson* test, "[d]irectorial interest exists whenever divided loyalties are present, or a director has received . . . a personal financial benefit from the challenged transaction . . . not equally shared by the stockholders." *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled in part on other grounds by Brehm*, 746 A.2d 244.  Under the second prong, a lack of business judgment may be found when the challenged transaction was either (i) not taken honestly or in good faith, or (ii) not based upon adequate information such that the board making the decision was not adequately informed.  *Disney I*, 825 A.2d at 286.[6]

Moreover, where, as here, a complaint alleges a breach of fiduciary duty based upon the directors' failure to act in good faith, a question of fact is sufficiently alleged.  *In re Abbott Labs. Derivative S'holders Litig.*, 325 F.3d 795, 811 (7th Cir. 2003) (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund*, 624 A.2d 1199, 1208-09 (Del.1993)).

---

[6] A lack of business judgment also may be found when the directors demonstrate a "conscious decision *to refrain* from acting." *Aronson*, 473 A.2d at 813 (emphasis added); *Rales*, 634 A.2d at 933; *Disney I*, 825 A.2d at 289.  For example, in *Disney I* the court found that the directors were alleged to have adopted an "ostrich-like approach" to whether the company should enter into a lavish employment agreement and that the Board allegedly knew and approved of the agreement but never sought to negotiate the amounts, raising a substantial likelihood of liability for violation of the duty of good faith and thus excusing demand.  *Disney I*, 825 A.2d at 289.

A derivative plaintiff is not required to plead particularized allegations for each Individual Defendant, especially where, as here, they acted affirmatively as a group to approve the three challenged transactions.  *Saito v. McCall*, No. 17132-NC, 2004 Del. Ch. LEXIS 205, at *32-33 (Del. Ch. Dec. 20, 2004), *overruled in part on other grounds by Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010) (demand excused because court could infer that *entire board* had knowledge of alleged accounting irregularities); *Buckley v. O'Hanlon*, C.A. No. 04-955(GMS), 2007 U.S. Dist. LEXIS 22211 at *14-15 (Del. Ch. Mar. 28, 2007).[7]

## B.    Pre-Suit Demand Upon the Board Would Have Been Futile

The conduct alleged in the Complaint unequivocally demonstrates that a pre-suit demand upon the Individual Defendants to investigate and sue themselves to recover damages for their own breaches of fiduciary in planning, approving, and implementing the Oceanbulk Merger, the Excel Transaction, and the Maritime Service Contracts would have been futile.  All three transactions were hopelessly tainted by patent self-dealing, and the Individual Defendants who conceived, planned, and executed them for their own self-interests to the great financial detriment of Star Bulk, received personal financial benefits from various transactions that were not shared with the Company or the unaffiliated shareholders.  Under those circumstances, the Individual Defendants were neither disinterested nor independent, and they could not be expected to validly exercise in good faith in light of their divided loyalties.

---

[7] *See Oxford Health Plans, Inc.*, 192 F.R.D. at 117 (in a "failure to monitor" case under Delaware law it is "unnecessary for the Court to address the issue of the independence or disinterestedness of the Directors individually"); *In re Massey Energy Co. Derivative and Class Action Litig.*, C.A. No. 5430-VCS, 2011 Del. Ch. LEXIS 83, at *71-72 (Del. Ch. May 31, 2011) (unnecessary to consider the "state of mind of each individual [director] defendant" at the demand futility pleading stage).  In fact, the requisite state of mind of the Individual Defendants may be inferred.  *See Abbott Labs.*, 325 F.3d at 808; *Am. Int'l Group, Inc. v. Greenberg*, 965 A.2d 763, 799 (Del. Ch. 2008) ("*AIG*") ("pled facts support an inference that Matthews and Tizzio were 'conscious of the fact that they were not doing their jobs'").

1.     **The Self-Dealing Oceanbulk Merger**

The Oceanbulk Merger was tainted by rampant self-dealing on the part of the Individual Defendants.  As alleged in the Complaint, in the Oceanbulk Merger, approved by the Board on June 16, 2014, Star Bulk – which consistently reported profitable operations in 2013 and 2014 – acquired Oceanbulk – which reported combined operating *losses* of more than $28 million in 2013 and the first quarter of 2014 – by issuing 54.1 million new shares of common stock to the Oaktree Defendants and the Pappas Defendants.  Compl. ¶¶ 50-53.  The Oceanbulk Merger also buried Star Bulk under $1.3 billion in new debt and required the Company to raise yet another $614 million in capital to complete.  Compl. ¶¶ 86-88.  As part of the Oceanbulk Merger, the Pappas Defendants and the Oaktree Defendants also converted $415 million of Star Bulk debt they owned into equity on terms that have never been disclosed – presumably because they favor the Defendants rather than the Company or its other, unaffiliated shareholders.  Compl. ¶ 88.

The Oceanbulk Merger was the brainchild of Defendant Schmitz.  Compl. ¶ 68.  Schmitz is Defendant Monarch's designee on the Board, and he shares substantial corporate interests with the Oaktree Defendants as well.  Compl. ¶¶ 69-70.  After proposing the transaction, Defendant Schmitz controlled the negotiating process for the Oceanbulk Merger.  Compl. ¶ 71.  Leaving nothing to chance, the Board hand-picked Defendant Schmitz – the architect of the transaction – as one of only two directors for the purportedly independent "Special Committee" despite being obviously interested in approving his own deal.  Compl. ¶ 79.  To no one's surprise, Schmitz's "Special Committee" subsequently approved the Oceanbulk Merger.  Compl. ¶ 71.  Given Schmitz's hopelessly conflicted dual roles, the "Special Committee" was mere window-dressing, rubber-stamping Schmitz's deal without an adequate investigation.  Compl. ¶ 81.

Rounding out the Oceanbulk Merger conflicts, Monarch (which has extensive economic affiliations with Oaktree, Pappas, and their affiliates, *see generally* Compl. ¶¶ 68-77), Oaktree

Dry Bulk Holdings LLC, and others entered into a Voting Agreement on June 16, 2014, memorializing Oaktree's demands as early as April 15, 2014, two months before the Oceanbulk Merger was entered into.  Compl. ¶¶ 73, 75-76.  The practical effect of the Voting Agreement was that the parties to it were fully interested in the transaction long before the Board approved it.  Compl. ¶ 73.

Defendants' argument that Plaintiff fails to allege that a majority of the Individual Defendants were interested or lacked independence in the Oceanbulk Merger is discredited by the Company's own public filings and must be rejected.  According to Star Bulk's Proxy Statement, filed on Form 6-K, filed with the Securities and Exchange Commission on June 20, 2014, Defendant Schmitz's "Special Committee" unanimously recommended the Oceanbulk Merger to the Board, and the Board (other than Defendants Pappas and Milena Pappas, who recused themselves due to their personal financial interest in the transaction) unanimously approved the merger.  *See* Compl. ¶ 53.  Therefore, Defendants Pappas and Milenia Pappas were admittedly interested in the Oceanbulk Merger, and the remaining Individual Defendants became interested in the merger – and thus disqualified from independently evaluating their own substantial liability for breaching their fiduciary duty – when they voted unanimously to approve it.

These well-pled facts in the Complaint create at least a reasonable doubt that all the Individual Defendants were disinterested and independent[8] and that the Oceanbulk Merger was

---

[8] Plaintiff is not required to allege that each Individual Defendant was interested or lacked independence, because Defendant Schmitz's interest and lack of independence tainted the two-man Special Committee and all the Individual Defendants acted affirmatively as a group to unanimously approve the merger.  *See Saito*, 2004 Del. Ch. LEXIS 205, at *32-33.  The Individual Defendants' interest and lack of independence may be inferred from the totality of circumstances alleged in the Complaint.  *See Abbott Labs.*, 325 F.3d at 808, and *AIG*, 965 A.2d at 799.

otherwise the product of a valid exercise of business judgment.  Accordingly, demand on the

Board was excused under either prong of the *Aronson* test.  *See Aronson*, 473 A.2d at 814.

2.      **The Self-Dealing Excel Transaction**

The Excel Transaction also is hopelessly tainted by disabling self-dealing.  As alleged in

the Complaint, on August 19, 2014, Star Bulk announced plans to acquire 34 drybulk vessels

from Excel for 29.9 million shares of Star Bulk common stock and $288.4 million in cash.

Compl. ¶ 97.  Excel is a bankrupt entity.  Compl. ¶ 101.  Oaktree and its affiliated entities are

secured creditors of Excel, and hold a claim against Excel in the bankruptcy.  *Id.*  With 48.1% of

Excel's outstanding equity, Oaktree is believed to be Excel's largest shareholder and has the

right to designate three members to the board of the holding company taking Excel's assets.

Compl. ¶ 102.

The Excel Transaction was structured to benefit Oaktree.  The acquisition is financed by

a Senior Secured Credit Agreement ("SSCA") between a wholly-owned subsidiary of Star Bulk

and various entities affiliated with the Pappas Defendants, the Oaktree Investors, and/or the

Monarch Investors.  Compl. ¶ 103.  The SSCA entities caused Star Bulk to borrow up to $231

million to complete the purchase, with the ships to be purchased from Excel as collateral for the

loan.  *Id.*  Put simply, the Defendants and their affiliates loaned Star Bulk (in which they own

80.2% of the outstanding equity) $213 million to purchase ships from Excel (in which they own

the largest portion of the outstanding equity), with the ships in question as collateral.  Compl. ¶

104.  This is the very definition of self-dealing.  *Id.*

As with the Oceanbulk Merger, the well-pled facts in the Complaint also create at least a

reasonable doubt that the directors were disinterested and independent in the Excel Transaction

and that it was otherwise the product of a valid exercise of business judgment.  Thus, demand on

the Board was excused under either prong of the Aronson test.  *See Aronson*, 473 A.2d at 814.

11

### 3.      The Self-Dealing Maritime Service Contracts to Pappas

Finally, the Service Contracts given to Pappas entities were also hopelessly tainted by disabling self-dealing.  As alleged in the Complaint, the Individual Defendants approved contracts with entities affiliated with Defendant Pappas for maritime services (routine ship maintenance services) to Star Bulk at the staggering cost of $750 per ship, per day.  Compl. ¶ 106.  In the aggregate, for Star Bulk's entire fleet of 103 ships, the Service Contracts entitled the Pappas-related entities to more than $28 million each year from the Company.  The Service Contracts pay the Pappas-related entities at a rate that is *three times the standard cost* for such services in the shipping industry.  *Id.*

Obviously, neither Pappas – who directly benefitted from the grossly excessive payments to his affiliated entities – nor the other Individual Defendants – who unanimously approved the enormously wasteful, self-dealing payments to Pappas's affiliates – was in any way independent or disinterested in this third challenged transaction.[9]  Nor were the grossly excessive Service Contracts even possibly the valid exercise of business judgment.  Under these circumstances, pre-suit demand on the Individual Defendants was excused.  *See Aronson*, 473 A.2d at 812.

Plainly, the Complaint raises a reasonable doubt that the Individual Defendants could consider a demand impartially.  *See id.* at 814.  Therefore, no pre-suit demand was required.

## II.    THE CHALLENGED TRANSACTIONS WERE NOT THE RESULT OF ADEQUATE BUSINESS JUDGMENT

In the Third Cause of Action, Plaintiff alleges that the Oceanbulk Merger and the Excel Transaction – both conflicted, self-dealing transactions in which the Individual Defendants

---

[9] Since Defendant Pappas was a beneficiary of the huge financial windfall from the Service Contracts, he appeared on both sides of Service Contracts and expected to derive a personal financial benefit from them.  Thus, he was disqualified from considering a pre-suit demand.  *See Oxford Health Plans*, 192 F.R.D. at 116 (quoting *Aronson*, 473 A.2d at 812).

squandered Star Bulk's assets by overpaying for troubled assets – were so grossly unfair as to constitute a waste of the Company's assets.  Defendants have moved to dismiss that waste claim on the basis that the transactions are protected by the business judgment rule.  They are not.

In *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979) (emphasis added), the Delaware Supreme Court described corporate waste as follows:

> The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes.  Although directors are given wide latitude in making business judgments, they are ***bound to act out of fidelity and honesty in their roles as fiduciaries***. *See, e.g.*, *Warshaw v. Calhoun*, Del.Supr., 43 Del. Ch. 148, 221 A.2d 487 (1966); 19 Am.Jur.2d, Corporations, § 1145 *et seq.*  And they may not, simply because of their position, "by way of excessive salaries and other devices, oust the minority of a fair return upon its investment."  *Baker v. Cohn*, N.Y.Supr., 42 N.Y.S.2d 159 at 166 (1942).

Plaintiff recognizes that the standard for stating a claim for corporate waste is high, but it is not insurmountable.  To state a claim for corporate waste, a plaintiff must allege that the transaction was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."  *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006) ("*Disney II*") (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)).  A claim of waste flows from the business judgment rule; therefore, the board's decision will not be upheld if it cannot be 'attributed to any rational business purpose.'" *Id.*  (quoting *Sinclair Oil Corp. Levien*, 280 A.2d 717, 720 (Del. 1971)).

Plaintiff easily satisfies even this relatively high pleading burden.  As alleged in the Complaint, the Individual Defendants (including the conflicted director, Defendant Schmitz), on behalf of Star Bulk, designed, pursued, and acquired Oceanbulk, which reported combined operating ***losses*** of more than $28 million in 2013 and the first quarter of 2014, at an enormous cost to the Company.  To buy that sinking business, the Individual Defendants caused Star Bulk

13

to issue 54.1 million new shares of common stock to the Oaktree Defendants and the Pappas Defendants, saddled the Company under $1.3 billion of new debt, and forced the Company to raise yet another $614 million in capital to complete the transaction.  Compl. ¶¶ 50-53; 86-88. The Individual Defendants also permitted the Pappas Defendants and the Oaktree Defendants to convert $415 million of Star Bulk debt they owned into equity, on secret terms that (presumably) favor Pappas and Oaktree rather than the Company or its unaffiliated shareholders.  Compl. ¶ 88.

The Oceanbulk Merger could not possibly have been the result of informed business judgment.  The acquisition unquestionably benefitted Pappas and Oaktree, but buying the troubled company at such a high price served no legitimate purpose for Star Bulk.  It "was so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."  *Disney II*, 906 A.2d at 74.  A paradigm of self-dealing, the Oceanbulk Merger unquestionably constituted waste of Star Bulk's assets.

The Excel Transaction, in which the Individual Defendants caused Star Bulk to buy troubled assets from a bankrupt company to protect Oaktree's position as Excel's largest shareholder and a secured creditor, also was the result of conflicted self-dealing that is not protected by the business judgment rule.  As alleged in the Complaint, to benefit Oaktree, the Defendants and their affiliates loaned $213 million to Star Bulk (in which they own 80.2% of the outstanding equity) to purchase ships from a bankrupt company, Excel (in which they own the largest portion of the outstanding equity), with the ships as collateral.  Compl. ¶ 104.  This is the very definition of self-dealing.  *Id*.

The Individual Defendants were so plainly interested in the Excel Transaction that it was not, and could not have been, the product of a valid exercise of business judgment.  *See Aronson*, 473 A.2d at 814.  Thus, the Excel Transaction also amounted to waste of Star Bulk's assets.

III.   **PLAINTIFF'S CLAIM FOR DILUTION IS DIRECT, NOT DERIVATIVE**

In the Fourth Cause of Action, Plaintiff asserts a direct dilution claim on behalf of itself and all the other members of the Class.  Plaintiff alleges that the Oceanbulk Merger and Excel Transaction – self-dealing transactions approved by Star Bulk's self-interested and hopelessly conflicted directors – substantially diluted the interest of Plaintiff and all other Class members in the Company.  As alleged in the Complaint, the Oaktree Investors, the Monarch Investors, and the Pappas Defendants and their affiliates collectively owned 43.9 percent of the shares of Star Bulk – less than a majority of the Company's stock – before the Oceanbulk Merger, but turned their ownership into a whopping 80.2 percent of the shares of Star Bulk – an overwhelming majority of the Company's stock – after the merger.  Compl. ¶ 3.  Plaintiff alone owned 1.4 percent of the Star Bulk shares before the Oceanbulk merger, but had his interest diluted by nearly three-fourths, to just 0.5 percent after the Oceanbulk Merger and only 0.34% after the Excel Transaction.  Compl. ¶ 4.  All other unaffiliated shareholders (*i.e.*, the other Class members) likewise had their interests in Star Bulk similarly diluted by the Oceanbulk Merger and the Excel Transaction.  Thus, in addition to wasting Star Bulk's corporate assets, the Oceanbulk Merger and the Excel Transaction caused a massive transfer of ownership from the unaffiliated shareholders to the Defendants with no consideration to the Class for the transfer.

Star Bulk is a Marshall Islands corporation.  Compl. ¶ 12.  The parties agree that Marshall Islands law "look[s] to Delaware corporate law." *Rosenquist v. Economou*, No. 2010-002, slip op. at 10 (Sup. Ct. Marshall Islands Oct 3, 2011).  Therefore, the parties agree that Delaware law governs whether Plaintiff's dilution claim is direct or derivative in nature.  *See San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 126 (S.D.N.Y. 2010).  And the parties agree that under Delaware law, that determination "turn[s] solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders,

15

individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

Under Delaware law, a claim is direct when the plaintiff suffers an injury "independent of any alleged injury to the corporation" and is able to "prevail without showing an injury to the corporation." *Tooley*, 845 A.2d at 1039. As a general matter, "dilution claims are typically viewed as derivative under Delaware law." *Feldman v. Cutaia*, 956 A.2d 644, 655 (Del. Ch. 2007), *aff'd*, 951 A.2d 727 (Del. 2008). This is because, unlike in this case, a plaintiff alleging such an ordinary dilution claim typically alleges "that the ***value*** of his stock will deteriorate and that the ***value*** of his proportionate share of the stock will be decreased as a result of alleged director mismanagement." *See Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) (emphasis added).

However, the Delaware Supreme Court has expressly held that not all dilution claims are derivative. In *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006), the Delaware Supreme Court held that under the *Tooley* analysis, a corporate transaction in which an excessive number of shares are issued, and which "causes an increase in the ***percentage*** of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share ***percentage*** owned by the public (minority) shareholders," is "both derivative and direct in character." *Id.* at 99-100 (emphasis added). *See also Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 391 (S.D.N.Y. 2013) (citing *Gentile*).

The distinction between the typical dilution case – which must be brought derivatively – and the direct dilution paradigm discussed in *Gentile* – which may be brought directly – is simple. In the typical dilution case, the plaintiff alleges a decrease in the ***value*** of his or her

16

shares.  In that case, the harm is the result of a decrease in the value of the company itself, which causes a corresponding decrease in the value of the plaintiff's static percentage interest in the company.  Such injury affects all shareholders *equally*, regardless of the number or percentage of shares they own.  As in *Gentile*, in the direct dilution paradigm, the plaintiff alleges a decrease in the ***percentage*** of his or her ownership, which corresponds to an increase in the ***percentage*** owned by the controlling shareholder(s).  The harm in the direct dilution paradigm is the result of a change in the plaintiff's relative percentage ownership, and is obviously independent of any change in the value of the company.  Moreover, injury in the direct dilution paradigm obviously affects shareholders *differently*: the plaintiff has *lost* significant ownership while the controlling shareholder has ***gained*** significant ownership.

In this case, Plaintiff alleges that as a result of the Oceanbulk Merger and the Excel Transaction, its ***percentage*** ownership interest in Star Bulk was dramatically and improperly reduced, from 1.4 percent before the two transactions to just 0.34 percent after the transactions were implemented.  As importantly, Plaintiff alleges that the Defendants' total percentage ownership of Star Bulk was dramatically increased, from just 43.9 percent (less than a majority of the shares) before the Oceanbulk Merger to 80.2 percent (a super-majority of Star Bulk's stock) after the two transactions were completed.  The dilution of Plaintiff's ***percentage ownership*** of the Company is separate and apart from the economic harm that Star Bulk itself suffered because of the waste of its assets.

Thus, under Delaware law, the dilution of Plaintiff's and the other Class members' ownership of Star Bulk undoubtedly gives rise to a direct, and not derivative, claim.  Entirely apart from wasting Star Bulk's corporate assets, the Oceanbulk Merger and the Excel Transaction transferred ownership of a substantial percentage of the outstanding stock from the

unaffiliated shareholders to the Defendants.  Before the Oceanbulk Merger, the Defendants

collectively owned only 43.9 percent of Star Bulk's stock – less than a majority of the shares –

and thus lacked complete control over the Company.  However, after the Oceanbulk Merger and

the Excel Transaction were consummated, Defendants saw their combined ownership rise to 80.2

percent of Star Bulk's stock – a super-majority of the shares – and thus absolute control over the

Company.  Those additional shares did not appear out of thin air.  Defendants dramatically

increased their ownership of Star Bulk stock at the expense of Plaintiff and the Class members,

whose own ownership interests were dramatically reduced.  This fits the Delaware direct dilution

paradigm exactly.

**IV.  THE COLLATERAL ATTACK ON MR. SU'S CREDIBILITY DOES NOT
RENDER PLAINTIFF INADEQUATE AS A REPRESENTATIVE OF THE
COMPANY OR THE CLASS**

Finally, in a desperate attempt to avoid liability to Star Bulk and the Class, Defendants

challenge Plaintiff F5's adequacy by attacking the credibility of its owner, Mr. Su.  Defendants'

unwarranted collateral attack on Mr. Su's credibility – which has nothing whatsoever to do with

this case – does not render Plaintiff F5 inadequate to represent Star Bulk on the derivative claims

or the absent Class members on the dilution claim.

As the district court held in *Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 315 (N.D.

Ohio 2009), "the general rule . . . is that unrelated unethical or even criminal conduct is not

sufficient to support a finding of inadequacy."  In that case, the defendant attacked the plaintiff's

adequacy as a class representative based upon similar allegations of dishonesty, both in the case

itself and in other unrelated matters.  The district court rejected the defendant's allegation that

the plaintiff testified untruthfully in the matter before it, and it held that an unrelated collateral

attack on the plaintiff's credibility, based on accusations of dishonesty in connection with his

separation from employment and a subsequent lawsuit, was unpersuasive.  As the district court

18

explained, "the cases finding inadequacy based on general credibility concerns have involved putative class representatives with confirmed (as opposed to alleged) credibility weaknesses (*e.g.* criminal convictions involving dishonesty) or, at least, some connection between the unethical or dishonest conduct and the claims at issue in the class action." *Id.* (citations omitted).  Nothing of the sort has been demonstrated here.[10]

## CONCLUSION

For all these reasons, the Court should deny Defendants' joint motion to dismiss the Complaint and allow this case to proceed on the merits.

Dated:  April 17, 2015                              Respectfully submitted,

        /s/ Mark C. Rifkin
Mark C. Rifkin
Benjamin Y. Kaufman
Lydia Keaney Reynolds
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Ave.
10th Floor
New York, NY  10016
(212) 545-4600

*Attorneys for Plaintiff F5 Capital*

/778650

---

[10] In the event this Court ultimately dismisses Plaintiff's Complaint, or any claim therein, Plaintiff reserves its right to amend the Complaint pursuant to Fed. R. Civ. P. 15.

## CERTIFICATE OF SERVICE

I, Mark C. Rifkin, hereby certify that on April 17, 2015, copies of the foregoing Plaintiff's Memorandum of Law in Opposition to All Defendants' Joint Motion to Dismiss were filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's electronic system.

    /s/ Mark C. Rifkin
Mark C. Rifkin
