UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

F5 CAPITAL, A CAYMAN ISLANDS
CORPORATION,

                   Plaintiff,

      -against-

PETROS PAPPAS; MILENA MARIA PAPPAS;
ROGER SCHMITZ; TOM SOFTELAND;
SPYROS CAPRALOS; KOERT ERHERDT;
RENEE KEMP; RAJATH SOURIE; EMILY
STEPHENS; STELIOS ZAVVOS; OAKTREE
VALUE OPPORTUNITIES FUND, L.P.,
OAKTREE OPPORTUNITIES FUND IX
DELAWARE, L.P., OAKTREE CAPITAL
MANAGEMENT, L.P., OAKTREE
OPPORTUNITIES FUND IX (PARALLEL 2),
L.P., MONARCH ALTERNATIVE SOLUTIONS
MASTER FUND LTD., MONARCH CAPITAL
MASTER PARTNERS II-A LP, MONARCH
CAPITAL MASTER PARTNER II LP,
MONARCH DEBT RECOVERY MASTER FUND
LTD., MONARCH OPPORTUNITIES MASTER
FUND LTD., P MONARCH RECOVERY LTD.,
STAR SYNERGY LLC; STAR OMAS LLC;
OAKTREE CAPITAL MANAGEMENT LP;
OAKTREE OBC HOLDINGS LLC; OAKTREE
DRY BULK HOLDINGS LLC; MILLENNIA
LLC; MILLENNIA HOLDINGS LLC; MIRABEL
SHIPHOLDING & INVEST LIMITED; MIRACH
SHIPPING COMPANY LIMITED; BLUESEA
OCEANBULK SHIPPING LLC; HERON
VENTURES LTD.; and OCEANBULK
CARRIERS LLC,

                   Defendants,

       -and-

STAR BULK CARRIERS CORP.,

                   Nominal Defendant.

</td><td>

14 Civ. 9356 (AT)

**MEMORANDUM
AND ORDER**

</td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/17/16____

ANALISA TORRES, District Judge:

Plaintiff, F5 Capital, brings shareholder derivative claims on behalf of Star Bulk Carriers Corporation ("Star Bulk") and a direct claim against Defendants, Star Bulk directors and other individuals and corporations affiliated with Star Bulk.  Defendants have filed three motions to dismiss: one joint motion on behalf of all Defendants, and two motions on behalf of certain groups of Defendants.  For the reasons stated below, the joint motion to dismiss is GRANTED, and the remaining motions are DENIED as moot.

## BACKGROUND[1]

I.      The Parties

Star Bulk is a global shipping company incorporated in the Marshall Islands and headquartered in Greece.  Compl. ¶ 12, ECF No. 1.  Plaintiff, a company that invests in international shipping securities, is a Star Bulk shareholder.  *Id.* ¶ 11.  Defendants are various individuals and entities affiliated with Star Bulk, and can be categorized as follows:

A.  Individual Defendants

Defendant Petros Pappas is a Greek citizen who was chairman of the Star Bulk board of directors prior to the Oceanbulk Merger, one of the transactions on which Plaintiff's claims are based and discussed *infra*, and became Star Bulk's CEO after the transaction closed.  *Id.* ¶ 13. Defendant Milenia Maria Pappas (together with Petros Pappas, the "Pappas Defendants") is the daughter of Petros Pappas and was a director of Star Bulk prior to the merger.  *Id.* ¶¶ 14, 64. Defendants Roger Schmitz and Tom Softeland are Star Bulk directors and served on the committee charged with reviewing and negotiating the Oceanbulk Merger before submitting the deal for board approval.  *Id.* ¶¶ 15, 16, 53.  Schmitz is also a managing principal of Defendant

---

[1] The following facts are taken from the complaint and accepted as true for the purposes of this motion.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.2d 97, 98 (2d Cir. 2007).

Monarch Alternative Capital LP ("Monarch") and sits as Monarch's representative on Star Bulk's board. *Id.* ¶¶ 53, 68-72, 76.  Defendant Spyros Capralos is a Star Bulk director and was president and CEO of Star Bulk prior to the merger. *Id.* ¶ 17, 53.  Defendant Koert Erhardt is a Star Bulk director. *Id.* ¶¶ 18, 122.  Defendants Renée Kemp, Rajath Sourie, and Emily Stephens are Star Bulk directors, appointed following the merger. *Id.* ¶¶ 95, 122.  Kemp, Sourie, and Stephens are employees of Defendant Oaktree Capital Management, L.P. ("Oaktree") and sit as Oaktree's representatives on Star Bulk's board. *Id.* ¶ 128.  Defendant Stelios Zavvos is a Star Bulk director, also appointed to the board after the merger. *Id.* ¶¶ 22, 95.

### B.  Star Bulk Defendants

Defendants Star Synergy LLC and Star Omas LLC are limited liability companies and subsidiaries of Star Bulk that were created as holding companies as part of the Oceanbulk Merger. *Id.* ¶¶ 25, 26.

### C.  Oaktree Defendants

Defendants Oaktree Capital Management, L.P., Oaktree Value Opportunities Fund, L.P., Oaktree Opportunities Fund IX Delaware, L.P., and Oaktree Opportunities Fund IX (Parallel 2), L.P. are affiliated with Oaktree, now the majority shareholder in Star Bulk, and an entity that, along with Defendants Oaktree OBC Holdings LLC, Oaktree Dry Bulk Holdings LLC, and entities owned by or affiliated with the Pappas Defendants, owned Oceanbulk Shipping LLC and Oceanbulk Carriers LLC ("Oceanbulk"), shipping companies whose merger with Star Bulk forms part of the basis for Plaintiff's claims. *Id.* ¶¶ 27-32, 48.

D.  Monarch Defendants

Defendants Monarch Alternative Solutions Master Fund Limited, Monarch Capital Master Partners II-A L.P., Monarch Capital Master Partner II L.P., Monarch Debt Recovery Master Fund Limited, Monarch Opportunities Master Fund Limited, and P Monarch Recovery Limited are affiliated with Monarch, a distressed debt investment firm and the manager of several affiliated entity shareholders of Star Bulk.  *Id.* ¶¶ 34-40.

E.  Pappas Entity Defendants

Defendants Millennia LLC, Millennia Holdings LLC, Mirabel Shipholding & Invest Limited, Mirach Shipping Company Limited, Bluesea Oceanbulk Shipping LLC, and Heron Ventures Limited are entities that hold or held assets related to the Oceanbulk Merger, or are companies that are controlled by the Pappas Defendants.  *Id.* ¶¶ 42-47.

II.   <u>Challenged Transactions</u>

Plaintiff's claims are based upon three allegedly self-interested transactions conducted by the Star Bulk board of directors: first, the acquisition by Star Bulk of Oceanbulk, an entity affiliated with the Oaktree and Pappas Defendants, as well as other Individual Defendants, at a "grossly inadequate and unfair price" under terms that diluted the interest of non-controlling shareholders in favor of that of Defendants (the "Oceanbulk Merger"), *id.* ¶¶ 49-95; second, the purchase of thirty-four (34) ships from Excel Maritime Carriers Ltd. ("Excel"), an entity affiliated with the Oaktree Defendants and certain Individual Defendants, for a "grossly excessive and unreasonable price" (the "Excel Transaction"), *id.* ¶¶ 96-104; and third, a series of service contracts into which Star Bulk entered with entities affiliated with Petros Pappas and

Erhardt, and which require payment of nearly "three times the standard industry price for services from those entities," *id.* ¶¶ 105-07.  The transactions are described in more detail below.

A.  Oceanbulk Merger

Oceanbulk was formed in 2012 as a privately held company controlled by Oaktree and its affiliates as well as other entities affiliated with Petros Pappas.  *Id.* ¶ 52.  Pappas served concurrently as the CEO of Oceanbulk and the non-executive chairman of Star Bulk.  *Id.* ¶¶ 52, 63.  On June 16, 2014, Star Bulk announced that it had entered into agreements with the Oaktree Defendants, the Pappas Defendants, and other entities owned by Petros Pappas to acquire Oceanbulk Shipping LLC, Oceanbulk Carriers LLC, and other Pappas-controlled entities in exchange for 54 million shares of Star Bulk common stock.  *Id.* ¶¶ 53, 56-61.  Plaintiff objected to the merger and directed that its shares be voted against the transaction, *id.* ¶¶ 92-94, but the merger was ultimately approved with 95.6% of outstanding Star Bulk shares voted in its favor, *see* Star Bulk Carriers Corp. Annual Report 2014, at xiv (*available at* http://www.starbulk.com/en/annual-reports); Decl. Gregory F. Laufer, Ex. A, ECF No. 66.[2]  Four Star Bulk directors—Shourie, Stephens, Kemp, and Zavvos—were appointed in connection with the merger's closing.  Compl. ¶ 95.

Plaintiff alleges that this transaction was conflicted in several ways.  First, Petros and Milenia Pappas, both Star Bulk board members, owned or were affiliated with various entities on both sides of the deal, and saw their share of Star Bulk common stock increase significantly following the merger.  *Id.* ¶¶ 63-65.  Additionally, the Oaktree Defendants and entities controlled by the Pappas Defendants loaned more than $415 million to Oceanbulk in connection with the

---

[2] The Court takes judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC.  *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

merger, the entirety of which was converted to equity "on terms that have never been disclosed" to Star Bulk shareholders.  *Id.* ¶ 67.  Following the merger, Defendants' collective share of Star Bulk stock increased from 43.9% to 80.2%, *id.* ¶ 89, with Oaktree becoming Star Bulk's largest shareholder, owning 61.3% of Star Bulk's outstanding common stock, *id.* ¶ 95.

Second, Schmitz, who is affiliated with Monarch, *id.* ¶¶ 68-72, 76, proposed the merger, *id.* ¶ 68, and was a member of the two-person committee (along with Softeland) that reviewed and negotiated the transaction before it was submitted for the board's approval, *id.* ¶¶ 68, 71, 79. Two months prior to the merger, and as a condition of Oceanbulk's acquisition, *see id.* ¶ 74, Monarch entered into a voting agreement with Oceanbulk by which Monarch agreed to vote Monarch's shares in favor of the transaction.  *Id.* ¶¶ 73-74.  Plaintiff contends that because Schmitz was the progenitor of the merger and affiliated with Monarch, which had committed to voting in favor of the merger, the transaction committee was conflicted.  *Id.* ¶¶ 79, 80. Additionally, Plaintiff contends that the committee failed to discharge its duty by investigating other potential transactions or bids.  *Id.* ¶ 82.  The committee had retained Evercore Group LLC ("Evercore"), an investment banking advisory firm, to issue a fairness opinion on the proposed merger, but Plaintiff claims the report was inadequate because it failed to sufficiently assess the merger's costs to Star Bulk and address risks and liabilities associated with the involved entities. *Id.* ¶¶ 83, 84.  Moreover, Evercore was promised a $2.95 million "success fee" upon completion of the merger.  *Id.* ¶ 85.

According to Plaintiff, the merger is harmful to Star Bulk because Star Bulk will need to incur an additional $1.3 billion in debt and raise an additional $614 million in capital, and because it resulted in the conversion of $415 million in debt held by the Pappas Defendants and

other entities under their control into Star Bulk equity, diluting other shareholders'—including Plaintiff's—equity in the company.  *Id.* ¶¶ 86-88.

B.  Excel Transaction

On August 19, 2014, Star Bulk announced its plan to acquire thirty-four (34) drybulk vessels from Excel for cash and nearly 30 million shares of Star Bulk common stock.  *Id.* ¶ 97. In order to fund the transaction, Star Bulk borrowed money from entities affiliated with the Oaktree Defendants.  *Id.*

Plaintiff claims that this transaction was conflicted and harmful because a year prior to the purchase, Excel had filed for bankruptcy and entered into a reorganization plan; Oaktree and unidentified affiliated entities hold a controlling share of the outstanding equity in Excel, and because they are also secured lenders for the company, they had a claim against Excel in connection with its bankruptcy.  *Id.* ¶¶ 101, 102.  In other words, the transaction was conflicted because Oaktree and other entities affiliated with various Defendants loaned Star Bulk, a company in which Defendants collectively hold 80.2% of the outstanding equity, money to purchase ships from Excel, another company in which several Defendants also hold the majority of outstanding equity and of which Oaktree was a creditor.  *Id.* ¶ 104.

C.  Service Contracts

Plaintiff also alleges that transactions whereby Star Bulk entered into ship maintenance service contracts with unidentified entities affiliated with the Pappas Defendants, agreeing to pay a rate three times the industry standard, are conflicted and harmful to Star Bulk.  *Id.* ¶¶ 106-07. Additionally, Petros Pappas directly receives a percentage of the revenue generated from the maintenance contracts.  *Id.* ¶ 107.

III.     Plaintiff's Claims and Defendants' Motions to Dismiss

Because of these transactions, which Plaintiff contends were harmful to Star Bulk and made in Defendants' self-interest, Plaintiff brings three derivative claims alleging that all Defendants breached their fiduciary duties of loyalty and good faith, or aided and abetted the breach of duties, and that the Individual Defendants committed corporate waste. *Id.* ¶¶ 130-38. Plaintiff also seeks to represent a class of Star Bulk shareholders other than Defendants alleging that Defendants' conduct resulted in the dilution of the shareholders' interest in Star Bulk. *Id.* ¶¶ 108-16, 139-42.

Defendants move to dismiss Plaintiff's complaint on various grounds. First, the Monarch Defendants move to dismiss Plaintiff's second and fourth causes of action (aiding and abetting breach of fiduciary duty and the direct claim of dilution) pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. ECF Nos. 45, 46. Defendants Petros Pappas, Milenia Maria Pappas, Softeland, Capralos, Erhardt, Zavvos, and Kemp, along with Oceanbulk Carriers LLC, the Star Bulk Defendants, and the Pappas Entity Defendants, move to dismiss the complaint pursuant to Rules 12(b)(2) and 12(b)(5) for lack of personal jurisdiction and insufficient service of process. ECF Nos. 49, 50. Finally, all Defendants jointly move to dismiss the complaint pursuant to Rule 23.1 for Plaintiff's failure to plead demand futility. ECF Nos. 63, 65. The Court will first address Defendants' joint motion to dismiss.

8

**DISCUSSION**

I.     Standard of Review

A.  Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When assessing the motion, the Court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, documents possessed by plaintiffs, or documents that plaintiffs knew about and relied upon.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  A district court considering a Rule 12(b)(6) motion must accept all factual allegations in the complaint as true, while also drawing all reasonable inferences in favor of the nonmoving party.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.2d 97, 98 (2d Cir. 2007).

B.  Demand

All Defendants seek to dismiss Plaintiff's derivative claims under Rule 23.1 on the grounds that it failed to make demand on the board before filing suit.  Plaintiff admits that it did not make demand, Compl. ¶ 120, but contends that demand was unnecessary because it would have been futile.  Defendants disagree.

A derivative suit permits "an individual shareholder to bring suit to enforce a *corporate* cause of action against officers, directors, and third parties."  *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (emphasis in original) (internal quotation marks and citation omitted).  However, because of the "fundamental precept that directors manage the business and affairs of

corporations," *Aronson v. Lewis*, 473 A.2d 805, 811-12 (Del. 1984), a plaintiff bringing a derivative claim must "state with particularity . . . any effort by the plaintiff to obtain the desired actions from the directors"—that is, making demand upon the board—"and . . . the reasons for not obtaining the action or not making the effort," Fed. R. Civ. P. 23.1(b)(3); *Canty v. Day*, 13 F. Supp. 3d 333, 341 (S.D.N.Y. 2014). Rule 23.1 requires particularized allegations, setting forth a "stringent" pleading standard that "differs substantially" from the standard a pleading must meet when facing a motion to dismiss pursuant to Rule 12(b)(6). *See In re JPMorgan Chase & Co. Derivative Litig.*, No. 12 Civ. 03878, 2014 WL 1297824, at *2 (S.D.N.Y. Mar. 31, 2014); *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010). When determining the adequacy of the pleading, the Court looks to the "substantive law . . . provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004). The Court agrees with the parties that Delaware law governs this analysis.[3]

Plaintiff did not make demand on the Star Bulk board. Accordingly, under Delaware law, Plaintiff "may not pursue a derivative suit to assert a claim of the corporation unless [it] . . . establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). That is, a plaintiff is excused from making demand if "the facts pled show that such demand would have been futile." *Canty*, 13 F. Supp. 3d at 343 (citing *Aronson*, 473 A.2d at 808). A shareholder's "purported corporate claim" cannot be based on "conclusions,

---

[3] Star Bulk is incorporated under the laws of the Marshall Islands, which in turn incorporates Delaware law. *Rosenquist v. Economou*, No. 2010-002, slip op. at 10 (Sup. Ct. Marsh. Is. Oct. 3, 2011); *accord.* 52 Marsh. Is. Rev. Code Part I, § 13. Accordingly, the Court will follow Delaware law in determining whether Plaintiff's complaint satisfies the demand requirement.

opinions, or speculation." *Brehm v. Eisner*, 746 A.2d 244, 254-55 (Del. 2000). Rather, demand is futile when "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. If Plaintiff's pleadings do not create a reasonable doubt as to either fact, then demand is not futile and the failure to make demand requires dismissal of the derivative claims. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005); *Seminaris v. Landa*, 662 A.2d 1350, 1354, 1355 (Del. Ch. 1995). Thus, the question is whether the pleadings give reason to doubt that the board of directors is disinterested and independent.

II.   Analysis

A. Director Interest and Independence

For the pleadings to satisfy the first test for showing demand futility, Plaintiff must provide a "detailed, fact-intensive, director-by-director analysis" showing that "a majority of the board of directors" serving at the time the complaint is filed is either interested or not independent.[4] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 985 (Del. Ch. 2007). There are nine directors currently serving on the Star Bulk board: Petros Pappas, Capralos, Softeland, Erhardt, Schmitz, Kemp, Sourie, Stephens, and Zavvos.[5] Compl. ¶ 122. Accordingly, Plaintiff must plead particularized facts showing that at least five of the board members are either interested or lack independence. A director is interested if she "appear[s] on both sides of a

---

[4] Plaintiff's argument that the Court can assess the interestedness of the board as a single group is unsupported by the law. *See Khanna v. McMinn*, Civ. A. No. 20545, 2006 WL 1388744, at *15 (Del. Ch. May 9, 2006).

[5] Being a defendant does not automatically excuse demand. *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) ("Demand is not excused solely because the directors would be deciding to sue themselves.").

transaction []or expect[s] to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812.  A director lacks independence if she is "so beholden to an interested director . . . that . . . her discretion would be sterilized." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) (internal quotation marks and footnotes omitted).  The allegations of each director's interest in the challenged transactions do not show that demand would be futile because of the board's interestedness or lack of independence.

    1.  Oceanbulk Merger

    a.  Renée Kemp, Rajath Sourie, and Emily Stephens

Kemp, Sourie, and Stephens were not on the Star Bulk board when the Oceanbulk Merger was executed.  That said, Plaintiff alleges that they could not impartially consider demand because they were designated to the board by Oaktree, their employer, which was on both sides of the merger and stood to benefit financially from it.  Furthermore, Plaintiff alleges that they were promised their seats on the condition that the merger succeed.  These pleadings, even taken as true, are insufficient to satisfy Rule 23.1.

That an entity is entitled to nominate an individual to the board does not mean that the individual is under the entity's control.  *See Aronson*, 473 A.2d at 816; *see also Andreae v. Andreae*, Civ. A. No. 11905, 1992 WL 43924, at *5 (Del. Ch. Mar. 5, 1992) (citing cases).  And alleging that Oaktree benefitted financially from the merger does not satisfy the burden of alleging that Kemp, Sourie, or Stephens each in turn received "a *personal* benefit . . . not equally shared by the shareholders" such that he or she would interested in the transaction.  *See Transeo*

*S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 396-97 (S.D.N.Y. 2013) (emphasis added); *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."). Without more, Plaintiff cannot overcome the "presumption of propriety" that Kemp, Sourie, and Stephens would consider Plaintiff's demand based on its "corporate merits . . . rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816.

> b. Stelios Zavvos

Plaintiff alleges that Zavvos could not impartially consider demand because he shares membership with Petros Pappas on the boards of two companies other than Star Bulk. Compl. ¶ 129. Additionally, Zavvos was appointed to the board in connection with the Oceanbulk Merger. *Id.* ¶ 95. These allegations, again, are insufficient to show interestedness or a lack of independence. That the merger resulted in Zavvos' appointment does not mean that Zavvos would be conflicted when assessing the merits of the transaction. And allegations of "a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam*, 845 A.2d at 1050; *see also Langner v. Brown*, 913 F. Supp. 260, 266 (S.D.N.Y. 1996) (holding that two directors' concurrent membership on the board of directors of another company is insufficient to establish lack of independence). Although Plaintiff contends that Zavvos is conflicted because of vague "established relationships and shared business interests" with Petros Pappas, Compl. ¶ 129, it provides no specific allegations of "financial ties, familial affinity, [or] a particularly close or intimate business or personal affinity . . . suggesting . . . bias." *Beam*, 845 A.2d at 1051-52. Even assuming that Petros Pappas

is conflicted, the allegations fail to suggest that his relationship with Zavvos would impair Zavvos' judgment when faced with demand.

    c.   Tom Softeland

Plaintiff alleges that Softeland could not impartially consider demand because, "[o]n information and belief," Softeland was given 15,000 restricted shares of Star Bulk common stock "in consideration for [his] approval of the Oceanbulk Merger." Compl. ¶ 126. Although such a fact, if true, may be reason to doubt a director's disinterest, Plaintiff's allegations, unsupported by detailed information about the transaction, do not meet the heightened standard required under Rule 23.1.

In general, that a director receives compensation is insufficient to show demand futility unless the plaintiff provides particularized allegations that the promised compensation is unusual or excessive, *see Orman v. Cullman*, 794 A.2d 5, 29 n.62 (Del. Ch. 2002); *Halpert Enters., Inc. v. Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y. 2005), or that the compensation is promised to a director contingent upon the board taking certain action, which can suggest a *quid pro quo* establishing a reasonable doubt that the director was disinterested in that action, *see In re Nat'l Auto Credit, Inc.*, Civ. A. No. 19028, 2003 WL 139768, at *8-10 (Del. Ch. Jan. 10, 2003).

Even taking as true that Softeland was granted shares on the same day the board approved the merger, Compl. ¶ 126, Plaintiff's speculative assertion that the shares were given in exchange for his vote approving the merger lacks the factual specificity that is required to raise doubt as to Softeland's impartiality. *C.f., e.g.*, *Rosenquist v. Economou*, No. 2010-002, slip op. at 21 (Sup. Ct. Marsh. Is. Oct. 3, 2011) (finding that allegations that a director received excessive compensation without providing information about how the compensation "relates to the usual

and customary fee typically received by directors" is insufficient to show demand futility); *Nat'l Auto Credit, Inc.*, 2003 WL 139768, at *8-10 (finding that the plaintiff established demand futility by detailing in its complaint the specific terms of board resolutions increasing director compensation passed on the same day as resolutions approving challenged transactions); *Friedman v. Beningson*, Civ. A. No. 12232, 1995 WL 716762, at *4-5 (Del. Ch. Dec. 4, 1995) (finding demand futility when the plaintiff alleged facts showing that a director received consulting fees from a board dominated by a single shareholder, suggesting "possible corporate retribution had [the director] exercised judgment in a way displeasing" to the controlling shareholder).  Given the "key principle" underlying the demand requirement that "the directors are entitled to a presumption that they [are] faithful to their fiduciary duties," *Beam*, 845 A.2d at 1048-49, the Court cannot find that Plaintiff has satisfied Rule 23.1's stringent standard for overcoming the presumption that Softeland is disinterested and independent.

Accordingly, Plaintiff fails to allege facts creating a reasonable doubt that Kemp, Sourie, Stephens, Zavvos, and Softeland—a majority of Star Bulk's board—are disinterested and independent with regard to the Oceanbulk Merger.

2.  Excel Transaction

Plaintiff alleges that Star Bulk directors were conflicted when approving the Excel Transaction in three ways.  First, unidentified entities allegedly affiliated with the Pappas Defendants provided credit to Star Bulk to purchase the ships from Excel.  Compl. ¶ 103. Second, the Oaktree designees to the Star Bulk board—Shourie, Stephens, and Kemp—stood to benefit from the transaction because Oaktree had claims against Excel in bankruptcy, unidentified entities affiliated with Oaktree owned equity in Excel, and Oaktree owned equity in

Star Bulk. *Id.* ¶¶ 101, 102, 104, 128.  Finally, Schmitz was interested in the transaction because unidentified entities affiliated with Monarch, of which he is a managing principal and which he represents on the Star Bulk board, also loaned Star Bulk money to purchase the ships.  *See id.* ¶ 127.  Plaintiff provides no specific allegations that any other director could not impartially consider demand regarding the Excel Transaction.

As discussed above, the allegations against Shourie, Stephens, Kemp, and Schmitz are insufficient to show that they are interested or lack independence because they fail to provide particularized facts showing that any of those directors stood to benefit from the transaction personally in a way not shared by shareholders generally, or that they were controlled by their employers.  *See Transeo S.A.R.L.*, 936 F. Supp. 2d at 396-97 (finding allegations that an entity stood to profit from a transaction insufficient to show that individuals affiliated with the entity also stood to profit); *Aronson*, 473 A.2d at 816 (finding allegations that an entity designated a director to a board insufficient to show that the director is controlled by the entity).  Even assuming *arguendo* that Petros Pappas is interested and lacks independence, Plaintiff has not met its burden to show that any other director is similarly conflicted.  *See, e.g.*, *In re JPMorgan Chase & Co. Derivative Litig.*, 2014 WL 1297824, at *7.  Accordingly, Plaintiff does not create a reasonable doubt that a board majority is disinterested and independent with regard to the Excel Transaction.

3.  Service Contracts

The allegations that Star Bulk directors are interested or lack independence with regard to the Service Contracts are similarly lacking.  According to Plaintiff, Star Bulk agreed to enter into ship maintenance contracts with unidentified entities affiliated with the Pappas Defendants, and

Petros Pappas himself receives a portion of the revenue that the contracts generate.  Compl. ¶¶ 106, 107.  Again, even assuming that Petros Pappas could not discharge his duty to consider demand, Plaintiff makes no particularized allegations as to the remaining directors, let alone a majority of the board, regarding the Service Contracts.  Accordingly, because the allegations do not create a reasonable doubt that a majority of the Star Bulk board is unable to consider demand because of interestedness or lack of independence, Plaintiff does not satisfy the first test for excusing demand.

      B.  Business Judgment Rule

A plaintiff can also establish demand futility by alleging particularized facts creating reasonable doubt that the challenged transactions were products of the directors' valid business judgment.  *Aronson*, 473 A.2d at 814.  The business judgment rule is a "powerful presumption," *Rales*, 634 A.2d at 933, and to overcome it, the pleadings must create a reason to doubt "(1) . . . that the action was taken honestly and in good faith or (2) . . . that the board was adequately informed in making the decision," *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d at 824.  The pleadings must allege specific facts showing that the directors failed to "inform themselves, prior to making a business decision, of all material information reasonably available to them." *Aronson*, 473 A.2d at 812.  "It is not sufficient . . . that the plaintiff simply disagrees with the merits of the challenged transaction, or even that a reasonable person might have acted differently." *Protas v. Cavanaugh*, Civ. A. No. 6555, 2012 WL 1580969, at *9 (Del. Ch. May 4, 2012).  Instead, the presumption protects decisions unless they "cannot be attributed to any rational business purpose." *In re INFOUSA, Inc.*, 953 A.2d at 972 (internal quotation marks and citation omitted).  As discussed below, because Plaintiff does not plead specific facts sufficient

to overcome the business judgment presumption for the challenged transactions, demand is not excused and the failure to make demand warrants dismissal of Plaintiff's derivative claims.

    1.  Corporate Waste

Plaintiff alleges that the board's approval of the Oceabulk Merger and the Excel Transaction were not exercises of valid business judgment because they constituted a waste of corporate assets.  Compl. ¶ 137.  The standard for overcoming the business judgment presumption in a corporate waste claim is very high.  In order to succeed, a plaintiff must show that an exchange was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."  *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 74 (Del. 2006).  Conduct constituting corporate waste arises only in the "unconscionable case where directors irrationally squander or give away corporate assets," *id.*, such as where "the challenged transaction served *no corporate purpose* or where the corporation received *no consideration at all*," *White v. Panic*, 783 A.2d 543, 554 (Del. 2001) (emphasis added).  The reason for the taxing burden is because the Court is "ill-fitted to attempt to weigh the adequacy of consideration under the waste standard or, ex post, to judge appropriate degrees of business risk."  *Id.* (citations omitted).  Thus, the Court should not displace a board's decision if there was "*any substantial* consideration" received by the corporation.  *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) (emphasis in original).

Again, Plaintiff fails.  Plaintiff claims that the Individual Defendants committed waste when they approved the acquisition of Oceanbulk, a company that had reported operating losses of more than $28 million prior to the merger.  Compl. ¶ 52.  Additionally, to complete the transaction, Star Bulk issued 54.1 million new shares of common stock to certain Defendants,

incurred $1.3 billion in debt, and was forced to raise an additional $614 million in capital. *Id.* ¶¶ 86-88. Although the expense was substantial, so too was the consideration received in exchange for it: through the merger, Star Bulk acquired fifteen operating ships and contracts for the construction of twenty-six more, positioning the company to become "the largest, diversified, ultra-modern U.S. listed dry bulk company" with "one of the largest eco fleets in the world." *Id.* ¶ 53. Such an exchange constitutes substantial consideration and precludes a finding of corporate waste.

Allegations that the approval of the Excel Transaction constituted waste are similarly lacking. Plaintiff admits that, in exchange for cash and nearly 30 million shares of Star Bulk common stock, Star Bulk received thirty-four ships from Excel. *Id.* ¶ 97. Although Plaintiff asserts that Star Bulk "overpa[id] for troubled entities," *id.* ¶ 137, the Court finds that Star Bulk in fact received substantial consideration in the transaction. In short, the facts alleged do not suggest that, in the Oceanbulk Merger or Excel Transaction, the "transfer of corporate assets was a gift" and could not be "attributed to any rational purpose" such that it constituted corporate waste. *Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 590 (Del. Ch. 2015).

2. Oceanbulk Merger

Nor do the pleadings otherwise create a reasonable doubt that the Oceanbulk Merger was a product of the board's valid business judgment. Plaintiff makes conclusory allegations that the Oceanbulk Merger was a "sweetheart deal" that was intended to benefit interested Defendants and not Star Bulk shareholders, *id.* ¶¶ 55, 86, but alleges no specific facts showing that the board did not act in good faith. The crux of the pleadings is that the merger was a poor decision, requiring Star Bulk to incur significant debt in exchange for assets that were overvalued. *See,*

*e.g.*, *id.* ¶¶ 52, 86-88, 90.  As discussed above, the Court will not rely on the benefit of hindsight to question the soundness of the board's business decision, nor will the Court assume, without facts suggesting otherwise, that the decision was made in bad faith.  *See Protas*, 2012 WL 1580969, at *11 (explaining that judicial deference to the board's assessment of risk without "hindsight bias is central to the protection that the business judgment rule affords corporate decisionmakers"); *Beam*, 845 A.2d at 1048 (emphasizing that, unless the complaint alleges otherwise, "directors are entitled to a presumption that they were faithful to their fiduciary duties").

Plaintiff makes one allegation suggesting that the shareholders were uninformed when considering the merger: prior to the merger, Oaktree and various unidentified entities controlled by the Pappas Defendants held $415 million of debt in Oceanbulk which was "converted to equity on terms that have never been disclosed" to the shareholders.  Compl. ¶¶ 67, 88.  Plaintiff does not allege, however, that the *directors* were uninformed about the terms when considering the deal.  And in general, the allegations do not specify that the board failed to "inform themselves of available critical information before approving the transaction," "consider expert opinion," or adequately deliberate on the merger, and thus do not create a reasonable doubt that the board exercised its valid business judgment.[6]  *See Grobow v. Perot*, 539 A.2d 180, 191 (Del. 1988).

---

[6] In fact, Plaintiff admits that the board formed a special committee to review and negotiate the deal, and retained Evercore, an investment banking advisory firm, to issue a fairness opinion about the deal, before voting to approve the merger.  Compl. ¶¶ 53, 83.  Although Plaintiff contends that the committee was interested and the fairness opinion inadequate, the Court disagrees.  Regarding the committee, that Schmitz proposed the idea for the merger does not indicate that he was conflicted when considering its merits.  *See Langner*, 913 F. Supp. at 265 ("Mere director approval of a transaction . . . is insufficient to excuse demand.").  And, as discussed *supra*, Schmitz's affiliation with Monarch, which had already agreed to vote in favor of the merger, does not signify that he was controlled by Monarch.  Regarding the fairness opinion, Plaintiff alleges that it was inadequate because it failed to assess the value of certain Star Bulk assets and consider potential costs Star Bulk would incur as a result of the

3.   Excel Transaction

The allegations also fail to raise a reasonable doubt that the Excel Transaction was a product of the board's valid business judgment.  Plaintiff contends that the transaction benefitted the Pappas Defendants and Oaktree, Star Bulk's largest investor, in two ways: first, because Oaktree was an Excel shareholder, and second, because both Oaktree and unidentified entities affiliated with the Pappas Defendants were creditors of the transaction.  *See* Compl. ¶¶ 97-104. Even taking these facts as true, the Pappas Defendants' self-interest does not impugn the judgment of the remaining directors, at least five of which—Schmitz, Softeland, Capralos, Erhardt, and Zavvos, a majority of the nine-member board—were disinterested.  *See, e.g.*, *In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, 42 F. Supp. 3d 473, 485 (S.D.N.Y. 2012) (explaining that, in order to find that an interested director controls his colleagues, a plaintiff "must point to a relationship that is so substantial that a non-interested director would be more willing to risk his . . . reputation than risk the relationship with the interested director" (citations omitted)).  And aside from Plaintiff's vague allegations that because of the directors' relationships with Petros Pappas and Oaktree they were beholden to them, the pleadings do not suggest that the board decision was made in bad faith or was uninformed, thus failing to create a reasonable doubt that the board exercised its valid business judgment.  *See, e.g.*, *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d at 824.

---

merger. Compl. ¶ 84.  The pleadings do not calculate those values and costs, however, and Plaintiff does not allege facts suggesting that if the fairness assessment had been conducted as Plaintiff wishes, it would have resulted in a finding that the deal was unfair or unwise.  *See Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 893-94 (Del. Ch. 1999).  Additionally, Plaintiff's argument that the opinion was flawed because Evercore received a success fee for the deal's completion, Compl. ¶ 85, is unsupported by law, *see In re Atheros Commc'ns, Inc.*, Civ. A. No. 6124, 2011 WL 864928, at *8-9 (Del. Ch. Mar. 4, 2011).

4. Service Contracts

As discussed above, Plaintiff's sole basis for challenging the Service Contracts is that Star Bulk is paying a rate allegedly three times greater than the industry standard, and that Petros Pappas is benefitting personally from the contracts. Because Plaintiff cannot rebut the business judgment presumption simply by "disagree[ing] with the merits of the . . . transaction, or [alleging] that a reasonable person might have acted differently," *Protas*, 2012 WL 1580969, at *9, and does not otherwise allege facts to show that the directors' decision approving the transaction was uninformed or in bad faith, the Court finds that the pleadings do not create a reasonable doubt that the transaction was a product of the board's valid business judgment.

5. Conclusion

Accordingly, Plaintiff is unable to meet either test for demonstrating demand futility. Because Plaintiff does not provide sufficient particularized allegations to demonstrate that a majority of the board is either interested or not independent, or that the board's decisions are not products of its valid business judgment, Plaintiff's failure to make demand is not excused, and Plaintiff's derivate claims—the first, second, and third counts in the complaint—are DISMISSED.

C. Direct Claim – Dilution

Defendants also move to dismiss Plaintiff's direct claim for dilution, arguing that it is actually derivative in nature and, accordingly, Plaintiff's failure to make demand warrants its dismissal. Plaintiff disagrees. As with the demand futility analysis, the law of the state of

incorporation governs the question of whether a claim is direct or derivative in nature.[7]  *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 126 (S.D.N.Y. 2010).

Whether a shareholder's claim is direct or derivative depends on (1) whether it was the corporation or the individual shareholders "who suffered the alleged harm," and (2) whether the corporation or the individual shareholders "would receive the benefit of any recovery or other remedy." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).  "If the corporation alone . . . suffered the alleged harm, the corporation alone is entitled to recover, and the claim . . . is derivative." *Feldman v. Cutaia*, 956 A.2d 644, 655 (Del. Ch. 2007).  On the other hand, "if the stockholder suffered harm independent of any injury to the corporation that would entitle him to an individualized recovery, the cause of action is direct." *Id.*  Dilution claims, which assert that shareholder equity is expropriated by the corporation issuing additional equity for inadequate consideration, are typically derivative in nature because the injury "falls upon all shareholders equally," affecting the individual shareholder only in proportion to its share of the corporation's equity.  *Id.*

Plaintiff admits that most dilution claims are derivative, but contends that its claim is distinguishable because it alleges that the percentage of its share of Star Bulk equity, and not the value of its holdings, was diluted vis-à-vis Defendants' share.  In support, Plaintiff cites *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006).  *Gentile*, however, is inapplicable here.  In that case, the plaintiff shareholder sued the chairman of the company's board (comprised of only two directors) who, *inter alia*, had converted company debt he held into equity at a rate significantly lower than that prescribed by the promissory note issued alongside the debt.  *Id* at 94-96.  The

---

[7] Accordingly, for reasons discussed *supra*, Delaware law applies.

chairman then negotiated a merger with another company in which the acquiring company agreed to, after one year, repurchase the chairman's shares at an excessive rate. *Id.* Thus, the chairman engineered a series of transactions that significantly increased his holdings in the company, benefitted him (and only him) financially, and left minority shareholders with equity diminished in proportion and value. The court found that this "species of overpayment claim" may be either direct or derivative, but only when the plaintiff alleges facts showing that:

> (1) a stockholder having majority or effective control cause[d] the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange cause[d] an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by [minority] shareholders.

*Id.* at 100. Thus, direct dilution claims may only be brought in circumstances where there exists a controlling shareholder[8] and where that shareholder "engineers a dilutive transaction whereby the [shareholder] receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration." *Feldman*, 956 A.2d at 657.

Plaintiff fails to allege facts showing such circumstances. First, Plaintiff admits that there was no controlling shareholder involved in the Oceanbulk Merger—Monarch, the largest shareholder prior to the merger, held only 21% of Star Bulk shares. Compl. ¶ 65. And even if other allegedly conflicted Defendants worked in concert—which Plaintiff's claims do not suffice to show, *see In re PNB Holding Co. S'holders Litig.*, Civ. A. No. 28, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006) (explaining that the equity held by separate shareholders cannot be

---

[8] Some case law suggests that a direct dilution claim can be brought where there is a shareholder that has effective control, even if not majority control. *See Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 657-58 (Del. Ch. 2013). The Court need not parse the difference here because it is not material to the analysis of Plaintiff's allegations. *See id.* (finding that a dilution claim, even if direct, still fails when "a majority of disinterested and independent directors approves the terms" of the dilutive transaction).

aggregated to treat the shareholders as a control group absent a voting agreement among the group or a "blood pact to act together")—Monarch, Oaktree, and the Pappas Defendants collectively held only 43.9% of Star Bulk shares.  Compl. ¶ 65.

Second, although the pleadings show that a controlling shareholder was involved in the Excel Transaction, they do not allege facts that would support a direct dilution claim.  Oaktree, which following the Oceanbulk Merger held 61.3% of Star Bulk's common stock, supported a transaction in which Oaktree itself stood to benefit.  *Id.* ¶ 95.  In consideration for 34 ships, *id.* ¶ 97, Star Bulk gave shares (along with cash) to Excel, a company of which Oaktree is a creditor and in which "entities affiliated with Oaktree" hold 48.1% equity, *id.* ¶¶ 101-02.  Plaintiff admits, however, that Oaktree's equity in Star Bulk *diminished* to 57.3% following the transaction.  *Id.* ¶ 97.  Moreover, there are no allegations that the 34 ships received in exchange for the shares constitute "inadequate consideration."  *Feldman*, 956 A.2d at 657.

Accordingly, Plaintiff fails to allege facts sufficient to support a direct claim for dilution. Because the dilution claim is derivative in nature, and because Plaintiff's failure to make demand is not excused as discussed *supra*, the motion to dismiss Plaintiff's fourth cause of action is GRANTED and the claim is DISMISSED.

III.  <u>Leave to Amend</u>

In its opposition papers, Plaintiff "reserves its right to amend" the pleadings should the Court dismiss the complaint.  Pl. Br. Opp'n Joint Mot, at 19 n.10, ECF No. 74.  Although leave to amend "shall be freely given when justice so requires," *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 745 F. Supp. 2d 303, 316 (S.D.N.Y 2010) (citations omitted); *accord.* Fed. R. Civ. P. 15(a), the rule is "not a shield against dismissal to be invoked as . . . a fallback position in

response to a dispositive motion," *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 318, 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009).  Absent "any identification of how a further amendment would improve upon the [c]omplaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Secs. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) ("Because an amendment is not warranted absent some indication as to what the plaintiffs might add to their complaint in order to make it viable, the [Court is] under no obligation to provide the plaintiffs with leave to amend their complaint." (internal quotation marks, alterations, and citations omitted)).  Accordingly, to the extent Plaintiff's footnote is a request for leave to file an amended complaint, Plaintiff's request is DENIED.

## CONCLUSION

Accordingly, for the reasons stated above, Defendants' joint motion to dismiss the complaint is GRANTED, and the remaining motions to dismiss are DENIED as moot.  The Clerk of Court is directed to terminate the motions at ECF Nos. 45, 49, and 63, and to close the case.

SO ORDERED.

Dated: February 17, 2016
         New York, New York

_____
ANALISA TORRES
United States District Judge

26